## BRYANT *vs.* MEAD.

The plaintiff being the keeper of a public gaming-room in the city of San Francisco, won of the defendant $4000 at the game of *Faro*. The money not being paid, this action was brought to recover it. *Held*, that it could not be sustained.

Such a debt was not recoverable at common law.

The statute of California authorizing the granting of a license to keep a gambling-house, should not be construed as conferring a *right to sue* for a gaming debt, but as a protection solely against a *criminal prosecution*.

APPEAL from the superior court of the city of San Francisco. The facts are stated in the opinion of the court.

*William Smith*, for the plaintiff.

*Jeremiah Clark*, for the defendant.

*By the Court*, BENNETT, J. The plaintiff was the keeper of a large public gaming-room in the city of San Francisco, in which the game of *Faro* was played. The defendant playing against the plaintiff as banker, at one of the *Faro* tables, lost the sum of four thousand dollars, and, not having the amount with him, gave the plaintiff two checks upon his banker; but, before the checks were presented, he countermanded the payment of them, and, when they were presented, payment was refused. This action is brought to recover the amount for which the checks were given, on the ground that, in such a case, an action could be sustained at common law.

No case was cited by the counsel for the plaintiff which goes to the extent of holding that money lost at a public table in a common gaming-room can be recovered, but the counsel relies upon the following doctrine laid down in *Bacon's Abridgment*, (*vol. 2, p.* 450,) "that a person who wins money at gaming, "may maintain a special *indebitatus assumpsit* for it; for the "contract is not unlawful in itself, and the winner's venturing "his money is a sufficient consideration to entitle him to the "action." But this general language should be taken in con-

nexion with that which immediately precedes it, and with that which follows. In the paragraph preceding the one quoted, the following language is used : " It seems that by the common " law, the playing at cards, dice, &c., *when practised innocently* " *and as a recreation, the better to fit a person for business,* is " not at all unlawful, nor punishable as any offense whatsoever." And in a succeeding paragraph it is said : " Also all *common* " *gaming-houses* are nuisances in the eye of the law, not only " because they are great temptations to idleness, but also be- " cause they are apt to draw together great numbers of disor- " derly persons, which cannot but be very inconvenient to the " neighborhood." And it is laid down by Blackstone, that gaming-houses are public nuisances, and may, upon indictment, be suppressed and fined. (4 *Blackstone's Comm.* 168 ; see also to same effect, *Rex* v. *Rogier,* 2 *D. & R.* 431 ; 1 *B. & C.* 117 ; *Rex* v. *Taylor,* 3 *id.* 502.)

In *Petersdorff's Abridgment,* (*vol.* 10, *p.* 228,) the principle is thus stated : " By the common law, the playing at cards, " dice, &c., when practised innocently and as a recreation, " the better to fit a person for business, is not unlawful, but " when the playing is, from the magnitude of the stake, exces- " sive, and such as is now understood by the term gaming, it is " considered by the law as an offense, being in its consequences " mischievous to society." Oliphant, in his work on Horse Races and Gaming, (*p.* 209 ; 48*th vol. of Law Library,*) sets forth the same doctrine somewhat more at large, and the case there cited, in which Ch. J. Hale permitted the defendant, in an action for the recovery of a gambling debt, to *imparl* from time to time, without putting him to the necessity of pleading his de- fense, shows that, in his estimation, the action was, at least, an inequitable one, and such as a court of equity would enjoin. Judge Story, (1 *Eq. Juris. sec.* 303,) says, " In regard to gam- " ing contracts, it would follow, that courts of equity ought not " to interfere in their favor, but ought to afford aid to suppress " them ; since they are not only prohibited by statute, but may " justly be pronounced to be immoral, as the practice tends to " idleness, dissipation, and the ruin of families. No one has

" doubted, that under such circumstances, a bill in equity might
" be maintained to have any gaming security delivered up and
" cancelled." A court therefore should not aid in enforcing
gaming contracts further than is absolutely required by the
strict letter of settled and unquestionable law. In *Petersdorff*
and *Oliphant*, above cited, a distinction is made between games
which are lawful, and games which are unlawful. That such a
distinction existed at common law, can scarcely be doubted.
The earliest English statutes speak of *unlawful games*, meaning,
of course, those which were unlawful at common law. The dis-
tinction is between such, on the one hand, as are innocent and
recreative in their design and effect, and such, on the other hand,
as are pursued as a business and from motives of gain; and this
distinction is said to be indicated by the amount at stake, or by
the nature of the game. The former is the ground on which it
is rested by Petersdorff, while Oliphant sustains it on both
grounds. In the latter work, a list of each kind is given, not as
exhausting the respective classes, but as presenting specimens
indicative of the distinction. " Pharaoh " (*Faro*) is put down
as an *unlawful game*.

In *Burling* v. *Frost*, (1 *Esp.* 235,) Lord Kenyon decided,
that £3 10s., won at " *All Fours*," (*Old Sledge, or Seven up,*)
might be recovered, declaring, however, at the same time, that
" he had never known such an action brought before."

In *Robinson* v. *Bland*, (2 *Burr*, 1077,) it was decided, that
money won in France was not recoverable in England, and that
a bill for the amount drawn payable in England, would not
support an action.

As has already been remarked, there is no direct authority
in support of the action; and no action should be permitted to
be brought to recover a gaming debt, unless it falls precisely
within the line of adjudicated cases. And it appears to me
that the action cannot be sustained even by the language of any
of the writers above cited. From these authors I should draw
the conclusion, First, that four thousand dollars, if won under
any circumstances, at what is called, I believe, a *round game*,
and in a private room, could not be recovered, because the

Bryant *v.* Mead.

amount is so large as to be excessive; Second, that the fact of its being won at a *bank game*, such as *Faro*, makes its recovery unlawful; and, Third, that its being won at a common gaming-house, by the owner and keeper thereof, would alone bar the recovery; for it would be strange, that the law should punish the prosecution of a particular business in a certain way, *criminaliter*, and should, at the same time, lend its aid to enforce contracts *civiliter*, which should be made for the furtherance and prosecution of such business.

But the counsel for the plaintiff cites the statutes of California, which permit the keeping of a gaming-house, after a license granted for that purpose. It is a sufficient answer to this, to say, that it does not appear that the plaintiff had taken out such license. But even if he had, it would not have influenced my opinion, for such license should not be construed as conferring a *right to sue* for a gaming debt, but as a *protection* solely against a criminal action.

For the above reasons, if there were no other, I think the judgment should be affirmed; but there is a broader ground upon which the case should stand. Wagers, which tend to excite a breach of the peace, or are *contra bonos mores*, or which are against the principles of sound policy, are illegal; and no contract arising out of any such illegal transaction, can be enforced. These are principles of the common law which has been adopted in this state; and whatever may have been the application of these principles in particular cases in England, I entertain no doubt, either of this case falling within their operation, or of the propriety of applying them in this and all similar instances.

Judgment affirmed.