[Civ. No. 25176.   Second Dist., Div. Two.   July 24, 1961.]

NEVCAL ENTERPRISES, INC. (a Corporation), Appellant, v. CAL-NEVA LODGE, INC. (a Corporation), Respondent.

Lester William Roth and Lawrence J. Rittenband for Appellant.

Parker, Stanbury, Reese & McGee, Raymond G. Stanbury and Parker, Stanbury, McGee, Peckham & Garrett for Respondent.

ASHBURN, J.—Plaintiff appeals from a judgment denying its prayer for an accounting of the profits of a gaming enterprise in Reno, Nevada.

By agreement of August 29, 1955, defendant (who controlled the same through nominees) agreed to sell to plaintiff a certain building in Reno wherein it conducted a gambling

casino under state license as well as a bar, restaurant and other activities. The base price having been fixed at $550,000, it was provided that the buyer should apply for and obtain gaming licenses and that thereupon the sale should be consummated and "[a]t the time of such consummation you [buyer] will be given credit for all profits from the date of acceptance of this proposal to the date of such consummation, and likewise shall suffer all losses during said period of time. If losses exist you shall pay the same at the time of the consummation of the sale." Buyer forthwith applied for requisite gaming licenses and, pending their approval and issuance, the seller's nominee continued to operate the property, including the gambling hall, until November 11, 1955, when the United States Government put an end to it by seizing in satisfaction of tax liens against defendant some $30,000 in coins and currency on the gambling tables, emptying the slot machines and appropriating all money contained therein; it also attached the bank accounts of defendant in the sum of about $23,000. This seizure resulted from failure of defendant to pay the approximate sum of $88,000 owing by it to the Government for delinquent taxes. The casino remained closed until December 1955, when plaintiff's licenses were granted and the gaming operations resumed. Between August 29 and November 11 the operations on the premises were profitable, the net income being $55,470.90, the greater portion of which was derived from the gambling.

Plaintiff sued for an accounting of said profits and for other relief. The trial judge held that this was a gambling contract opposed to the public policy of California, found that all other issues had become immaterial and denied any relief.[1]

The contract in question, though made in California, re-

---

[1]Though it complains that several other important issues were thus ignored, respondent says in its brief: "Nevertheless, for the purpose of considering the legal issue on this appeal, it must be assumed that respondent did undertake to account to appellant for the profits derived from operation of the gaming casino and other parts of the premises sold." The issues thus left unresolved are mentioned in the court's finding IX as follows: "The Court makes no finding respecting the issue of novation, or as to the legality or illegality, or enforceability or unenforceability, of the contract under Nevada law, or on any other issue not found on above, for the reason that the case is disposed of by the findings made. The defendant asserts no defense that the contract was not legal or unenforceable in the State of Nevada and no presumption is indulged in by the Court that the law of Nevada is the same as the law of California on the question of enforceability,"

quired performance in Nevada through carrying on a business that was and is there licensed and "a lawful enterprise in Nevada." (*Las Vegas Hacienda, Inc.* v. *Gibson*, —— Nev. —— [359 P.2d 85, 86].) The validity of such a contract generally is governed by the law of place of performance. (*Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241, 272, 274 [65 P.2d 42]; *Duntley* v. *Tutt*, 48 Cal.App.2d 367, 370, 371 [119 P.2d 804]; *Rodriguez* v. *Barnett*, 52 Cal.2d 154, 160 [338 P.2d 907]; 11 Cal.Jur.2d § 56, p. 138; Rest., Conflict of Laws, § 347, p. 427; 11 Am.Jur. § 136, p. 427; 12 Cal.Jur.2d § 69, p. 272.)

Defendant having reaped profits belonging to plaintiff under the terms of the contract, a right of accounting naturally arises unless the taint of gambling renders the above cited cases inapplicable. It should be remembered that the rights of no member of the public are involved, merely the contractual rights of the parties to a deal involving the running of a gambling casino in Nevada, a lawful project.

Two lines of cases discuss the problem of whether the courts of the forum will recognize and enforce a gambling contract which is valid in the state where the cause of action arose but would have been contrary to local public policy had it been performed in the state of the forum. They of course arrive at different results. (See anno. in 173 A.L.R. 695, 696, 704.)

In certain of the decisions in this state gambling is declared *contra bonos mores* (*Braverman* v. *Horn*, 88 Cal.App. 2d 379 [198 P.2d 948]; *Lavick* v. *Nitzberg*, 83 Cal.App.2d 381, 383 [188 P.2d 758]; *Union Collection Co.* v. *Buckman*, 150 Cal. 159, 161 [88 P. 708, 119 Am.St.Rep. 164, 11 Ann. Cas. 609, 9 L.R.A. N.S. 568]), and hence unlawful. Here we have the question of whether the adverse public policy of California (23 Cal.Jur.2d § 71, p. 697) is so definite and strong that it will not extend comity to a valid contract thus tainted with the California concept of iniquity, though performed in Nevada.

*Loranger* v. *Nadeau*, 215 Cal. 362, 366 [10 P.2d 63, 84 A.L.R. 1264]: "It is the general rule in tort actions that the court will, if it has jurisdiction of the necessary parties, and can do substantial justice between them in accordance with its own forms of procedure, enforce the foreign law, if it is not contrary to the public policy of the forum, to abstract

justice or pure morals, or injurious to the welfare of the people of the state of the forum. (12 Cor. Jur., p. 453.) In *Loucks* v. *Standard Oil Co.*, 224 N.Y. 99 [120 N.E. 198, 202], it was said: 'The courts are not free to refuse to enforce a foreign right at the pleasure of judges, to suit the individual notion of expediency or fairness. They do not close their doors, unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.' '' *Biewend* v. *Biewend*, 17 Cal.2d 108, 113 [109 P.2d 701, 132 A.L.R. 1264]: ''Such a rule of comity is subject to the principle that foreign laws will not be given effect when contrary to the settled public policy of the forum. [Citations.] It must be clear, however, that the enforcement of the right obtained under the laws of another state would be prejudicial to recognized standards of morality and to the general interests of the citizens in the state of the forum.''

In these modern days Californians cannot afford to be too pious about this matter of gambling. Stud poker is contrary to good morals (so it seems), but not draw poker or draw low ball poker (*Remmer* v. *Municipal Court*, 90 Cal.App.2d 854, 856-857 [204 P.2d 92]; *Monterey Club* v. *Superior Court*, 48 Cal.App.2d 131, 146 [119 P.2d 349]), although they actually constitute gambling. (*Lavick* v. *Nitzberg, supra*, 83 Cal.App.2d 381, 382-383.) This situation grows out of the concept that the ''determination of public policy of states resides, first, with the people as expressed in their Constitution and, second, with the representatives of the people—the state Legislature.'' (*Jensen* v. *Traders & General Ins. Co.*, 52 Cal.2d 786, 794 [345 P.2d 1].) So draw poker, not being declared illegal by statute, is held to be lawful (*Monterey Club* v. *Superior Court, supra*, at p. 148). Hence some of our less ascetic communities license draw poker parlors which are conducted to the edification of the citizenry and presumably to the profit of the treasury and the taxpayer.

Horse racing was said in *Hankins* v. *Ottinger*, 115 Cal. 454, 456 [47 P. 254, 40 L.R.A. 76], to contravene good morals, and it was held that bets thereon are unenforceable. But the legislature by enactment of the Horse Racing Act of 1933 (codified as Bus. & Prof. Code, §§ 19400-19663), and the People by constitutional amendment ratifying said law (Const., art. IV, § 25a), have reversed that policy with respect to such gambling done upon the licensed premises of a racing

association and through pari-mutuel machines. The state licenses qualified applicants to conduct horse racing and betting thereon if made within the track enclosure and through the pari-mutuel betting machines, i.e., where the customers bet with each other and not with the house. If made inside the fence the bet is lawful (Bus. & Prof. Code, § 19594) and winnings recoverable. But if made outside, bets are still illegal and the proceeds not recoverable. (*People* v. *Torrey,* 16 Cal.App.2d 470, 472 [60 P.2d 900]; *People* v. *Wilson,* 19 Cal.App.2d 340 [65 P.2d 834].) All persons other than those specifically mentioned in section 19572 (such as known bookmakers or touts) have a right to enter the race track and indulge freely in betting. (*Cf. Flores* v. *Los Angeles Turf Club,* 55 Cal.2d 736, 742 [13 Cal.Rptr. 201, 361 P.2d 921].) The state itself has a large interest in the enterprise through fees collected by it based upon percentages of the betting pool ranging from 5 per cent to 8 per cent of the gross, also through its right to half of the breakage (§ 19491).

County fairs are placed in the same status as licensed race tracks for betting on horse races (§§ 19560-19573).

One of the major differences between the California license and one issued by Nevada is that the former legalizes the licensed gambling (Bus. & Prof. Code, § 19594) but the latter does not (*West Indies, Inc.* v. *First National Bank of Nevada,* 67 Nev. 13 [214 P.2d 144, 151-154]). It merely legalizes the conduct of a state-supervised gambling establishment (*Id.*); but it does not enable the licensee to recover a gambling debt incurred in the licensed premises (*Id.*). On the other hand a patron who has a winning ticket on a Keno game cannot collect it through the courts (*Weisbrod* v. *Fremont Hotel, Inc.,* 74 Nev. 227 [326 P.2d 1104]).

California is so definitely committed to the doctrine that public policy concerning gambling is a matter for the legislature rather than the courts, that no injunction will issue against the conducting of an unlicensed gambling establishment except as prescribed by statute. So held in *People* v. *Lim,* 18 Cal.2d 872 [118 P.2d 472]. At page 876 the court says: "It must be conceded that the cases cited by plaintiff, as well as many others, demonstrate that a gambling house constituted a public nuisance at common law for the purposes of a criminal prosecution." At page 879: "We think the proper rule, therefore, and the one to which this state is

committed is expressed in the following language from *State* v. *Ehrlick, supra* [65 W.Va. 700 (64 S.E. 935, 23 L.R.A. N.S. 691)] : 'It is also competent for the Legislature, within the constitutional limits of its powers, to declare any act criminal and make the repetition or continuance thereof a public nuisance . . . or to vest in courts of equity the power to abate them by injunction; but it is not the province of the courts to ordain such jurisdiction for themselves.' " At page 880 : "Thus, for the reasons set forth, the basis for an action such as this must be found in our statutes rather than by reference to the common law definitions of public nuisance."

All this leaves little room for California courts to be shocked or to prate of public morals or public policy when confronted with an application for relief upon a contract for the operation of a licensed gambling parlor within the State of Nevada. Such a contract is one for the accomplishment of a legal objective, certainly not contrary to the public policy of Nevada and essentially not in conflict with that underlying the California Horse Racing Law.[2]

The briefs of counsel proceed largely upon the hypothesis that the contract in question contemplated an unlawful objective. But that is not the case. It plainly provided for the doing of lawful acts in a lawful manner (conducting a Nevada gambling casino) and cannot fairly be said to be opposed to the public policy of this state.

Judgment reversed.

Fox, P. J., and McMurray, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 20, 1961.

---

[2]True, the statute solemnly declares that "[t]he purpose of this chapter is to encourage agriculture and the breeding of horses in this State" (§ 19401), but the customers are inclined to smile when this laudable phase of the activity is mentioned.

*Assigned by Chairman of Judicial Council.