### KING INTERNATIONAL CORPORATION v. MARVIN VOLOSHIN

SUPERIOR COURT      NEW HAVEN COUNTY      FILE NO. 134915

Memorandum filed June 22, 1976

*Ritter, Tapper & Totten,* for the plaintiff.

*Winnick, Resnik, Skolnick & Auerbach,* for the defendant.

GRILLO, J. The fundamental questions involved in the present proceedings are whether the ancient and deep-rooted policy against gambling, as enunciated by the Supreme Court of this state, has been abandoned in view of the recent legalization of certain forms of gambling in Connecticut, and, in view thereof, whether the present cause of action, akin to those heretofore denied by Connecticut courts; *Ciampittiello* v. *Campitello,* 134 Conn. 51, 55; *Hilton of San Juan, Inc.* v. *Lateano,* 6 Conn. Cir. Ct. 680; can now be maintained. The plaintiff claims that, since Connecticut now sanctions the promotions of gambling activities, it would be unreasonable for this state not to accord legal recognition to an out-of-state gambling obligation incurred in a licensed gambling casino. The plaintiff requests our courts to recognize that obligation by denying the present motion.

The plaintiff, the owner and operator of a government-licensed gambling casino in Aruba, Netherlands Antilles, seeks to recover $15,000. That amount was stipulated as advanced to the defendant by the plaintiff on December 28, 1975, in the form of gambling chips which were used for gambling by the defendant. The parties further have stipulated that the advance of the $15,000 resulted in a legal and enforceable obligation incurred by the defendant under the laws of the Netherlands Antilles. The defendant executed a check to the order of the plaintiff in the amount of $15,000, and, subsequently, the defendant stopped payment of that check.

It is clear that the law of the locality where a contract is made is to be applied by the courts of this state. *Breen* v. *Aetna Casualty & Surety Co.,* 153 Conn. 633, 637. Ordinarily Aruban law would apply in this situation since "it is our settled policy to keep our courts open for the enforcement of a proper foreign law unless a well-established public policy forbids." *Ciampittiello* v. *Campitello,* supra, 55. Therefore, the defendant's obligation may be the basis for a judgment by this court unless that is precluded by a clear-cut, substantial public policy forbidding recognition of Aruban law.

In 1971, the Connecticut legislature broke with the state's long tradition of prohibiting gambling and established the commission on special revenue consisting of a state lottery division, a state racing division, and a state off-track betting division. General Statutes §§ 12-557, 12-567. In particular, the legislature authorized (1) the operation of a lottery; General Statutes § 12-568; (2) the establishment of off-track betting parlors; General Statutes § 12-571; and (3) parimutuel betting at licensed racing events. General Statutes § 12-575. Thereafter, in 1972, the legislature reenacted the pre-

ceding provisions and, in addition, gave authorization to the commission on special revenue for the operation of frontons for the exhibition of jai alai. General Statutes § 12-573a. In 1975, the legislature added an instant lottery. General Statutes § 12-568, as amended by Public Acts 1975, No. 75-344. In 1976, the legislature authorized a daily lottery. Public Acts 1976, No. 76-387, § 4.

The public support for those gambling activities appears to be widespread. The commission on special revenue estimates that, on the average, 600,000 people, or about thirty percent of the entire adult population of the state, participate in the weekly lottery. There are more than 3200 privately-owned stores and shops selling lottery tickets throughout the state. Licenses have been issued for one greyhound track in Plainfield, for jai alai frontons in Hartford, Bridgeport, and Milford, and for a combination harness and thoroughbred racetrack, the location to be determined in the future.

In each town where an application is filed for a racetrack or fronton license, a referendum is required. General Statutes § 12-574a. In addition to the people who have supported the approval of the facilities mentioned above, the people of Middletown and Wolcott have supported the idea of a combination track in their towns. According to the commission on special revenue, only the people of Southington denied support for a racing facility.

In the first twenty weeks of operation, the attendance at the greyhound track in Plainfield averaged 5185 people each night and the amount wagered averaged a total of $439,000 each night. The total attendance in twenty weeks was 648,175 and the total amount wagered during that period was $56.3 million. In the first twenty performances of jai alai in Hartford, the attendance averaged 4613 each day

and the amount wagered averaged $232,959 each day. In the first eight performances of jai alai in Bridgeport, the attendance averaged 3694 each day and the amount wagered averaged $207,090 each day.

Off-track betting parlors opened on April 29, 1976, in ten Connecticut communities: Bridgeport, Bristol, Derby, Meriden, Norwich, Waterbury, Torrington, Killingly, New London and West Haven. The municipal legislative authority approved the parlors in each instance after public hearings. Although facilities have not yet opened, parlors have also been approved by local governments following hearings in six other towns: Norwalk, Newington, New Haven, Enfield, East Haven and Shelton. In the first month of operation, bets totaling $5,604,000 were placed at the off-track betting parlors; on the average, 70,000 transactions a day were made.[1]

The court also notes that the legislature has authorized bingo; General Statutes § 7-169; bazaars and raffles; General Statutes § 7-170; and other games of chance, for nonprofit organizations. General Statutes § 7-186a.

In spite of the legislation set forth above, however, Connecticut has never deviated from its ancient prohibition of gambling on credit.[2] Agents

---

[1] The data set forth in the several preceding paragraphs were obtained from the commission on special revenue by the court with acquiescence of the parties. Even if the data were omitted, however, the court would reach the conclusion reflected in its judgment.

The data, of course, represent the status of matters specified as of the time of the writing of this opinion.

[2] "[General Statutes] Sec. 52-553. WAGERING CONTRACT VOID. All wagers, and all contracts and securities whereof the whole or any part of the consideration is money or other valuable thing won, laid or betted, at any game, horse race, sport or pastime, and *all contracts to repay any money knowingly lent* at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at

are to sell lottery tickets for cash, not for credit. General Statutes § 12-569 (b). Also, all bets at off-track betting facilities "shall be made with United States currency." Regs., Conn. State Agencies § 12-571-9 (d). "All [parimutuel] ticket sales shall be for cash." Regs., Conn. State Agencies §§ 12-574-A14 (f), (thoroughbred); 12-574-B14 (f), (harness); 12-574-C14 (f), (greyhound); 12-574-D14 (f), (jai alai). Telephone betting is allowed, but only after the bettor applies to the commission on special revenue and places in his deposit account a minimum against which he can bet. Regs., Conn. State Agencies § 12-571-10. As such, telephone betting cannot be considered gambling on credit.

The prohibition of gambling on credit has been a part of anti-gambling statutes in this state for about two hundred years. Old statute books indicate that the predecessors of General Statutes §§ 52-553 and 52-554 were enacted in 1797. Statutes, 1808, p. 361; *Wheeler* v. *Spencer,* 15 Conn. 28, 30.

It is not incongruous for a legislature to sanction certain forms of gambling and still to refuse the collection of gambling debts. The policy of protection against financial ruin that underlies § 52-553 and the public policy prohibiting the extending of

---

such time and place, so pays, bets or wagers, shall be void, provided nothing herein contained shall affect the validity of any negotiable instrument held by any person who acquired the same for value and in good faith without notice of illegality in the consideration. [Emphasis added.]"

"[General Statutes] Sec. 52-554. RECOVERY OF MONEY LOST IN GAMING. Any person who, by playing at any game, or betting on the sides or hands of such as play at any game, loses the sum or value of one dollar in the whole and pays or delivers the same, or any part thereof, may, within three months next following, recover from the winner the money, or the value of the goods, so lost and paid or delivered, with costs of suit, in a civil action, without setting forth the special matter in his complaint. If the defendant refuses to testify, if called upon in such action, relative to the discovery of the property so won, he shall be defaulted; but no evidence so given by him shall be offered against him in any criminal prosecution."

betting credit are valid state concerns. The observation by the court in *Zellers* v. *White,* 208 Ill. 518, might well apply to situations that could develop were a state to give carte blanche to those who would extend and to those who would receive credit for gambling purposes: "The evils resulting [from gambling] are among the most pernicious that afflict modern society. . . . The loser becomes intent on recovering his losses at the gaming table and is frequently driven to embezzlement and theft. . . . Financial ruin . . . inevitably overtake[s] every man who cannot resist its allurements, no matter with what degree of skill he engages in the nefarious business." Id., p. 526; see *Macchio* v. *Breunig,* 125 Conn. 113, 121.

While the state's heretofore ancient and deep-rooted policy condemning gambling has been eroded to some degree by its legalization of certain types of gambling, the state has, nevertheless, been intransigent in its policy prohibiting the extension of credit for the promotion of gambling activity—and with good reason. One need not have the gambling sagacity of the famed Las Vegas oddsmaker Jimmy the Greek to recognize the potential dangers in the extension of credit to the gambler or the possibly unfortunate incidents, to employ a euphemism, that could well result from the nonpayment of the gambling bettor to his creditor.

It is the conclusion of this court that the legalization of gambling in a limited and regulated manner, while constituting a change to some degree in this state's ancient and deep-rooted public policy prohibiting gambling, has had no effect on the long-established policy of this state condemning gambling on credit and prohibiting the enforcement of any claimed obligation relating thereto.

Summary judgment, therefore, may enter for the defendant.