STATE of Wisconsin, Plaintiff-Appellant,

v.

Robert Michael GONNELLY, Defendant-Respondent.

Court of Appeals

*No. 92–1232–CR. Submitted on briefs October 14, 1992.—Decided December 30, 1992.*

(Also reported in — N.W.2d —.)

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Alan R. Kesner,* assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Dennis M. Cook* of *Cook & Franke, S.C.* of Milwaukee.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

SNYDER, J.   The state appeals from an order dismissing the criminal complaint and information against

Robert Michael Gonnelly. The complaint and information had charged Gonnelly with three felony counts of issuing a worthless check, contrary to sec. 943.24, Stats. Gonnelly cashed the checks at Geneva Lakes Kennel Club (GLKC) for the purpose of gambling. The issues on appeal are whether the checks are gaming contracts under sec. 895.055, Stats., and, if so, whether sec. 895.055, which voids gaming contracts, prohibits their enforcement despite sec. 943.24, the worthless check statute. We conclude that the checks are gaming contracts and that sec. 895.055 prohibits their enforcement. We affirm the trial court.

Between November 9 and 21, 1990, Gonnelly cashed three checks at GLKC worth a total of $23,700. The checks were returned nonsufficient funds (NSF). Gonnelly moved to dismiss the complaint on the grounds that the checks were gaming contracts void under sec. 895.055, Stats. For purposes of the motion, the parties stipulated that Gonnelly cashed the checks to obtain money to bet on the dog races at GLKC and, in fact, bet the money he received on the dog races. They also stipulated that GLKC cashed Gonnelly's checks to provide him with money to bet on the dog races at GLKC and knew that Gonnelly was going to bet the money on the dog races at GLKC. The trial court granted the motion, concluding that the checks were void under sec. 895.055. The state appeals.

■

The state argues that because the checks here are not gaming contracts in the first instance, they are not void under sec. 895.055, Stats. It also argues that, regardless of whether or not the checks are gaming contracts, Gonnelly is liable for them under sec. 943.24, Stats. Accordingly, we must first interpret the statutes, and then apply the undisputed facts to that interpretation.

Both tasks present a question of law. *Zimmerman v. DHSS*, 169 Wis. 2d 498, 504, 485 N.W.2d 290, 292 (Ct. App. 1992).

We begin with the gaming contract statute. Section 895.055, Stats., provides:

> **Gaming contracts void.** *All promises*, agreements, notes, bills, bonds, or other contracts, mortgages, conveyances or other securities, *where the whole or any part of the consideration of such promise*, agreement, note, bill, bond, mortgage, conveyance or other security *shall be for money* or other valuable thing whatsoever won or lost, laid or staked, or *betted at* or upon any game of any kind or under any name whatsoever, or by any means, *or upon any race*, fight, sport or pastime, or any wager, or for the repayment of money or other thing of value, lent or advanced at the time and for the purpose, of any game, play, bet or wager, or of being laid, staked, betted or wagered thereon *shall be absolutely void*; provided, however, that contracts of insurance made in good faith for the security or indemnity of the party insured shall be lawful and valid. [Emphasis added.]

The state asserts that the checks are not gaming contracts, and that a gaming contract arose only later when Gonnelly actually placed a bet. It contends that although both parties may have contemplated that Gonnelly would use the proceeds for gambling purposes, that was simply their understanding, not a requirement. Nothing written on the checks indicates that they were cashed only upon the condition that the money received in exchange would be used to place bets.

The state also points out that the checks necessarily could not have contained any other promise or obligation such as one to use the proceeds to gamble at the track. In support, it looks to ch. 403, Stats., which pro-

vides that a check is a negotiable instrument and a negotiable instrument must contain an unconditional promise or order to pay a sum certain in money and no other promise or obligation. Section 403.104(1)(b) and (2)(b), Stats.

These arguments fail. Taking the state's ch. 403, Stats., argument first, we reject it because it presumes that the check is not void in the first instance. As will be explained later in the opinion, there is a difference between "worthless" and "void" checks. Chapter 403 may apply to "worthless" checks but it does not apply to "void" ones.

We also reject the state's argument that the checks had to contain, as consideration, some condition that the money be used to gamble. Section 895.055, Stats., requires no such written condition. Rather, it requires only that "the whole or any part of the consideration" be for "money . . . won or lost, laid or staked, or betted at or upon . . . any race . . . for the repayment of money," such as the races at GLKC. *Id.* The parties established this by stipulation.[1]

---

[1] Another court decided the matter similarly, even absent a stipulation. In *Connecticut National Bank v. Kommit*, 577 N.E.2d 639 (Mass. App. Ct. 1991), the defendant, a Massachusetts resident, used his credit card to withdraw $5500 from an automatic teller machine (ATM) located in the gambling area of an Atlantic City, New Jersey casino. The Connecticut bank which issued the card was held sued Kommit seeking payment of the money. Kommit argued that he borrowed the money for gambling purposes and that, given the location of the ATM, the bank should have known that the ATM was intended to advance funds for gambling. After determining that Connecticut law governed the action, the court stated that the debt would be void if the bank "knew or should have known that the money was borrowed for gambling." *Id.* at 641. This is significant to the instant case because to determine the elements required to sustain a defense,

Finally, we reject the state's argument that the checks are not themselves gaming contracts. The Minnesota Court of Appeals recently had occasion to address a similar question to that posed here. *State v. Stevens*, 459 N.W.2d 513 (Minn. Ct. App. 1990). Like Wisconsin, Minnesota endorses certain forms of gambling yet also has a statute voiding gaming contracts. *See* Minn. Stat. sec. 541.21 (Supp. 1989). In *Stevens*, the defendant wrote checks to purchase $465 worth of legal "pull-tabs." When the checks were returned NSF, the state charged him with theft by check. The trial court granted the defendant's motion to dismiss. The court of appeals affirmed, concluding that the gaming contract statute applied to Stevens checks. *Id.* at 514–15.

The state's attempt to distinguish *Stevens* from the case here is to no avail. It notes that in *Stevens* the checks were exchanged directly for the pull-tabs; here, Gonnelly exchanged the checks for cash and then placed wagers. The state argues that if instead of gambling with the cash received from the checks Gonnelly had taken it and spent it elsewhere, GLKC would have had no recourse against him.

The trial court found *Stevens* persuasive and so do we. We agree with Gonnelly that the distinction the state draws is insignificant. Permitting the placing of wagers by check would be inefficient and time-consuming. On-track betting is not conducive to such a set-up. By contrast, purchasing pull-tabs by check does not pose

---

the *Kommit* court looked to a Connecticut statute which is virtually identical to sec. 895.055, Stats. *See* Conn. Gen. Stat. Ann. sec. 52–553 (West 1992). The Wisconsin and Connecticut statutes differ in that Connecticut's requires proof that money "knowingly" was lent for gambling. Wisconsin's has no knowledge requirement. The difference is immaterial here, however, because the parties stipulated that GLKC had knowledge.

such time and administrative obstacles. Moreover, the parties' stipulation satisfies us that both GLKC and Gonnelly contemplated that the money would be used for gambling and that, in fact, it was.

The state contends, however, that even if the checks are gaming contracts, they still are enforceable under the worthless check statute. Section 943.24(2), Stats., provides:

> Whoever issues any single check . . . for the payment of $500 or more or whoever within a 15-day period issues more than one check . . . amounting in the aggregate to $500 or more which, at the time of issuance, the person intends shall not be paid is guilty of a Class E felony.

The state argues that whether or not a check is void as a gaming contract under sec. 895.055, Stats., should be immaterial to a criminal prosecution under sec. 943.24(2) as long as the necessary elements are established. Those elements are that (1) the defendant issued a check (2) for the payment of $500 or more (3) intending, at the time of issuance, that the check not be paid.

An enticing argument, it nonetheless fails because the necessary elements cannot be established here. Section 943.24, Stats., addresses "worthless" checks. Gonnelly's checks are *void* under sec. 895.055, Stats., not *worthless* under sec. 943.24(2). "Void" means "[n]ull; ineffectual; nugatory; having no legal force or binding effect . . . .. An instrument or transaction which is wholly ineffective, inoperative, and incapable of ratification and which thus has no force or effect so that nothing can cure it." BLACK'S LAW DICTIONARY 1573 (6th ed. 1990). "Worthless," when used in the context of a worthless

check, means a check "drawn on a bank account which is no longer open or on an account with funds insufficient to cover the check." *Id.* at 1607. Consequently, the sec. 943.24(2) elements cannot be established because a check, even if worthless, still is a legal instrument invoking legal obligations. *See* sec. 403.104, Stats. A void check, by contrast, is of no legal consequence.

The state also complains that the case was dismissed on an improper ground. The trial court stated in its decision that GLKC "should have known the checks were void and thus could not have been defrauded when it cashed the checks and gave defendant money with which to gamble." The state argues that fraud is not an element of sec. 943.24(2), Stats. We agree with that reading of the statute, but disagree with the state that the lack of fraud "is the basis upon which the case was dismissed." That was but one comment in a two-page decision. Moreover, we read the court's statement as a comment on the checks' voidness as gaming contracts, not on their worthlessness because of their ultimate NSF status.

The state then argues that to afford GLKC no redress would be unfair because GLKC cannot be held to have known that under sec. 895.055, Stats., checks would be considered unenforceable gaming contracts. This argument likewise fails. Section 895.055 has been on the books in some form since 1858 and was modified to its present form in 1878. In 1965, and again in later years, the state constitution was amended to permit certain forms of gambling. *See* WIS. CONST. art. IV, § 24. Those amendments are reflected in the statutes. *See* ch. 562, Stats. ("Regulation of Racing and On-Track Pari-Mutuel Wagering"); ch. 563, Stats. ("Bingo and Raffle Control"); and ch. 565, Stats. ("Lottery").

Undaunted, the state argues that by legalizing various gambling activities, Wisconsin has impliedly repealed its long-held legislative ban on the collection of certain gambling debts such as those incurred in pari-mutuel wagering. The state concedes that the implied repeal of statutes is disfavored. *Pattermann v. City of Whitewater,* 32 Wis. 2d 350, 356, 145 N.W.2d 705, 708 (1966). Indeed, a strong public policy exists which favors the continuing validity of a statute except where the legislature has acted explicitly to repeal it. *State v. Christensen,* 110 Wis. 2d 538, 546, 329 N.W.2d 382, 385–86 (1983). The rule against implied repeal especially applies where the earlier statute is of long standing and has been stringently followed, unless it is so manifestly inconsistent and repugnant to the later statute that the two cannot reasonably stand together. *Pattermann,* 32 Wis. 2d at 356–57, 145 N.W.2d at 708. The earlier statute also may be set aside where the legislative intent to repeal by implication clearly appears. *Id.* at 356, 145 N.W.2d at 708.

Whenever we engage in statutory interpretation, we may look to extrinsic sources if the legislative intent is unclear from the face of the statute. *See Zimmerman,* 169 Wis. 2d at 504–05, 485 N.W.2d at 292. Whether the intent is clear is a question of law which we review *de novo. See id.* at 505, 485 N.W.2d at 292. It is not clear from the face of sec. 895.055, Stats., whether the legislature intended that it not apply to legalized gambling. Accordingly, we may look to other sources.

The statute's history reveals that the legislature considered addressing this problem and rejected that avenue. A proposed amendment to sec. 895.055, Stats., would have added this sentence: "This section does not

512

apply to wagers permitted under ch. 562." Sec. 25, Assembly Sub. Amdt. 1, 1987 S.B. 444. Chapter 562, Stats., permits, among other things, pari-mutuel wagering at dog tracks. The proposed amendment did not pass. That it was considered and rejected deflates the state's argument of implied repeal. It is not for this court to do what the legislature has chosen not to do.

Furthermore, sec. 895.055, Stats., and the statutes permitting certain forms of gambling are not necessarily inconsistent with and repugnant to each other. A Connecticut court addressed this question in a case where the defendant had purchased with a check $15,000 worth of gambling chips and then stopped payment on the check. *King Int'l Corp. v. Voloshin,* 366 A.2d 1172, 1173 (Conn. Super. Ct. 1976). The casino owner sought to recover the $15,000. Like Wisconsin, Connecticut has both an old statute prohibiting the collection of gambling debts and the more recent legalization of some gambling. We find persuasive the Connecticut court's reasoning. The court stated:

> The prohibition of gambling on credit has been a part of anti-gambling statutes in this state for about two hundred years.. . . It is not incongruous for a legislature to sanction certain forms of gambling and still to refuse the collection of gambling debts. The policy of protection against financial ruin that underlies s 52–553 [Connecticut's analog to sec. 895.055, Stats.] and the public policy prohibiting the extending of betting credit are valid state concerns.. . .
>
> It is the conclusion of this court that the legalization of gambling in a limited and regulated manner, while constituting a change to some degree in this state's ancient and deep-rooted public policy prohibiting gambling, has had no effect on the long-estab-

lished policy of this state condemning gambling on credit and prohibiting the enforcement of any claimed obligation relating thereto.

*Id.* at 1174–75.

Finally, the state argues that not to hold Gonnelly responsible will result in his unjust enrichment. In support, the state cites *Lemon v. Grosskopf,* 22 Wis. 427 [*447] (1868), where the plaintiff was involved in an illegal gambling contract yet was allowed to maintain an action for recovery. The reason the court so ruled, however, was that the person against whom the court said the action could be brought was a third party to the transaction whose actions were not a part of the illegal gambling activity. *Id.* at 432–33 [*453]. *Lemon* thus does not apply here because GLKC clearly was a party to the transaction.

We make no comment as to whether the result dictated here is a desirable one. Our task is simply to ascertain the legislative intent of the statutes. If another result is deemed wiser, it is for the people—through the legislature—and not for this court to fashion one.

*By the Court.*—Order affirmed.