[No. A060580. First Dist., Div. Five. May 27, 1993.]

METROPOLITAN CREDITORS SERVICE OF SACRAMENTO, Plaintiff and Appellant, v.
SOHEIL SADRI, Defendant and Respondent.

**COUNSEL**

Lloyd Oliver Clark and David G. McInnes for Plaintiff and Appellant.

Mannina, Tambling & Mannina and Harrett W. Mannina, Sr., for Defendant and Respondent.

## OPINION

KING, J.—

### I. INTRODUCTION

In this case we hold that a Nevada cause of action to enforce gambling debts incurred at a casino for the purpose of providing the debtor with funds for gambling violates California's public policy against gambling on credit and thus is unenforceable in this state.

Metropolitan Creditors Service of Sacramento (MCS) challenges a municipal court judgment declining to enforce gambling debts incurred by Soheil Sadri at a Lake Tahoe casino. We affirm.

### II. BACKGROUND

Sadri, a California resident, incurred debts totaling $22,000 over a two-day period in 1991 while gambling at Caesar's Tahoe casino in Nevada. On January 13 and 14 he wrote the casino two personal checks for $2,000 and $10,000. On January 14 he executed two memoranda of indebtedness for $5,000 each. In exchange for the checks and memoranda, Sadri received chips, which he lost playing the game of baccarat. Sadri subsequently stopped payment on the checks and memoranda, which were drawn on his account at a Redwood City bank.

A Nevada statute makes credit instruments evidencing gambling debts owed to licensed persons, and the debts represented, valid and enforceable by legal process. (Nev. Rev. Stat. Ann. § 463.368 (Michie 1991).) This law took effect in 1983. (Nev. Rev. Stat. Ann. § 463.368, subd. (1) (Michie 1991).) Gambling debts were previously unenforceable in the Nevada state courts. (E.g., *West Indies* v. *First Nat. Bank of Nevada* (1950) 67 Nev. 13 [214 P.2d 144].)

Caesar's Tahoe did not, however, seek a judgment in Nevada on Sadri's debts. Instead, the casino assigned its claims to MCS for collection, and MCS sued Sadri in California, filing a complaint in municipal court in San Mateo County.

The municipal court rendered judgment for Sadri, ruling that under established public policy his gambling debts were unenforceable in California. The Appellate Department of the San Mateo County Superior Court affirmed the judgment, and on its own motion certified the case for transfer to the

Court of Appeal (Cal. Rules of Court, rule 63(a)), which we ordered (Cal. Rules of Court, rule 62(a)).

### III. DISCUSSION

 MCS contends that under the constitutional doctrine affording full faith and credit to the public acts, records, and judicial proceedings of other states (U.S. Const., art. IV, § 1), we are required to enforce Sadri's gambling debts pursuant to the Nevada statute allowing the cause of action for enforcement of such debts.

The pivotal question is whether such enforcement is against the public policy of the State of California. This question arises because MCS is attempting to enforce its Nevada *cause of action*, rather than a Nevada *judgment.* A forum state must give full faith and credit to a sister state *judgment,* regardless of the forum state's public policy on the underlying claim. (*Fauntleroy* v. *Lum* (1908) 210 U.S. 230 [52 L.Ed. 1039, 28 S.Ct. 641]; Rest.2d, Conf. of Laws, § 117.) However, the forum state may refuse to entertain a lawsuit on a sister state *cause of action* if its enforcement is contrary to the strong public policy of the forum state. (Rest.2d, Conf. of Laws, § 90; see *Harrah's Club* v. *Van Blitter* (9th Cir. 1990) 902 F.2d 774, 777.)

California's public policy exception to enforcement of a sister state cause of action is narrow in scope. It applies only where the sister state law violates recognized standards of morality and the general interests of California citizens. (*Wong* v. *Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [216 Cal.Rptr. 412, 702 P.2d 570]; *Knodel* v. *Knodel* (1975) 14 Cal.3d 752, 765, fn. 15 [122 Cal.Rptr. 521, 537 P.2d 353].) This approach was enunciated long ago by Justice Cardozo, who explained that courts will not refuse to enforce a foreign cause of action unless application of the foreign law "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." (*Loucks* v. *Standard Oil Co.* (1918) 224 N.Y. 99, 111 [120 N.E. 198, 202].)

 California has always had a strong public policy against judicial enforcement of gambling debts, going back virtually to the inception of statehood. This prohibition is deeply rooted in Anglo-American jurisprudence, originating in England in 1710 in the Statute of Anne, which made gambling debts "utterly void, frustrate, and of none effect, to all intents and purposes whatsoever . . . ." (9 Anne, ch. 14, § 1.)

In the earliest California case, *Bryant* v. *Mead* (1851) 1 Cal. 441, the defendant lost $4,000 playing faro at the plaintiff's San Francisco gaming

house. The defendant paid the debt with two checks, but then stopped payment on them. The Supreme Court refused to enforce the debt on the ground, among others, that "[w]agers, which tend to excite a breach of the peace, or are *contra bonos mores*, or which are against the principles of sound policy, are illegal; and no contract arising out of any such illegal transaction, can be enforced." (*Id.* at p. 444.) At that time the statutes of California permitted operation of licensed gaming houses, and the plaintiff was apparently unlicensed, but the court commented that even if the plaintiff had held a license "such license should not be construed as conferring a *right to sue* for a gaming debt, but as a *protection* solely against a criminal action." (*Ibid.*, original italics.)

Two years later, in *Carrier* v. *Brannan* (1853) 3 Cal. 328, where the defendant lost $17,000 in a gaming house playing faro, the Supreme Court reaffirmed the rule against judicial enforcement of gambling debts. The court stated, "It needs no authority or arguments to satisfy this court that the practice of gaming is vicious and immoral in its nature, and ruinous to the harmony and well-being of society. Neither do we think that gaming debts have been legalized by the operation of the act of the legislature licensing gaming-houses. [¶] The legislature, finding a thirst for play so universally prevalent throughout the State, and despairing of suppressing it entirely, have attempted to control it within certain bounds, by imposing resrictions [*sic*] and burdens upon persons carrying on this kind of business. The license simply operates as a permission, and removes or does away with the misdemeanor which existed at common law without changing the character of the contract." (*Id.* at p. 329.)

After gambling at most games of chance was criminalized (see Pen. Code, § 330 et seq.), the rule of *Bryant* and *Carrier* was restated in statutory terms. In *Union Collection Co.* v. *Buckman* (1907) 150 Cal. 159 [88 P. 708], the defendant gave the plaintiff's assignor three promissory notes for a $1,300 gambling loss. Citing Civil Code sections 1607 and 1667, the Supreme Court said the assignor and hence the plaintiff could not recover on the notes because "under the settled law of this state the consideration for such notes was *contra bonos mores* and unlawful . . . ." (150 Cal. at p. 161.) Section 1607 states that consideration for a contract must be lawful. Section 1667 states that a contract is unlawful if it is contrary to "an express provision of law," "the policy of express law, though not expressly prohibited," or "good morals."

Following the advent of legalized gambling in the State of Nevada, the rule in California against enforcement of gambling debts was once again put to the test, and it again prevailed. In *Hamilton* v. *Abadjian* (1947) 30 Cal.2d

49 [179 P.2d 804], the defendant gave a Las Vegas hotel six checks totaling $11,450, used part of the proceeds to finance his gambling, and then stopped payment on the checks. The Supreme Court reaffirmed *Bryant, Carrier* and *Union Collection Co.*, noting that the courts of California—and also, at that time, Nevada—"refuse to lend their process to recover losses in gambling transactions of the type here involved." (*Hamilton v. Abadjian, supra,* 30 Cal.2d at p. 51.)

The *Hamilton* court also stated the antienforcement rule within a context more specific to the facts of that case, as well as to the present case: "The owner of a gambling house who honors a check for the purpose of providing a prospective customer with funds with which to gamble and who then participates in the transaction thus promoted by his act cannot recover on the check." (30 Cal.2d at p. 52; accord, *Braverman v. Horn* (1948) 88 Cal.App.2d 379, 381 [198 P.2d 948]; see also *Sasner v. Ornsten* (1949) 93 Cal.App.2d 467 [209 P.2d 44]; *Rose v. Nelson* (1947) 79 Cal.App.2d 751 [180 P.2d 749].)

Shortly after *Hamilton,* in a decision reminiscent of the early days of legalized gambling in California and the *Bryant* and *Carrier* cases, the court in *Lavick v. Nitzberg* (1948) 83 Cal.App.2d 381 [188 P.2d 758] refused to compel payment on checks totaling $2,000 given to the owner of a California gaming house to purchase chips lost at draw poker, which is a lawful game in California. The *Lavick* court reasoned that even though draw poker is not made a crime by Penal Code section 330, a contract founded upon a gambling consideration is still against public policy and contrary to good morals under Civil Code section 1667, and thus the contract itself is unlawful and unenforceable. (83 Cal.App.2d at pp. 382-383.) Echoing *Hamilton,* the *Lavick* court concluded that "promissory notes given in a gaming-house to the keeper of the house for the purpose of enabling the maker to participate in any game of chance with the keeper or his employees are unenforceable under the provisions of section 1667 of the Civil Code." (*Id.* at p. 383.)

The most recent statement of the *Hamilton* rule occurred in *Lane & Pyron, Inc. v. Gibbs* (1968) 266 Cal.App.2d 61, 63 [71 Cal.Rptr. 817]. In that case the defendant cashed five checks totaling $1,900 at a Lake Tahoe casino and subsequently stopped payment on the checks. Noting that a sister state cause of action will not be enforced if it "offends deeply held notions of local public policy," the court invoked the policy in California and Nevada against judicial enforcement of gambling debts and concluded that "California's rejection of such claims is an application of Nevada law as well as domestic public policy." (*Id.* at p. 65.)

The *Hamilton* rule is on all fours with the present case. Caesar's Tahoe honored Sadri's checks and memoranda of indebtedness for the purpose of providing him with funds with which to gamble, and then participated in the game. Thus, if *Hamilton* still reflects the public policy of the State of California, it precludes judicial enforcement of Sadri's gambling debts in California state courts; as explained in *Lavick*, the contracts underlying the debts are against public policy and contrary to good morals under Civil Code section 1667, and thus the contracts are unlawful and the debts unenforceable.

Two things have changed in the 46 years since *Hamilton* was decided. First, under Nevada state law, credit instruments evidencing gambling debts owed to licensed persons are now enforceable by legal process in that state, and have been since 1983. (Nev. Rev. Stat. Ann. § 463.368 (Michie 1991).) This point is inconsequential, however, since the rule of *Hamilton*, its predecessors and its progeny rests not on the public policy of Nevada, but on the public policy of California.

Second, the people of California have demonstrated increased tolerance for gambling through the passage, by initiative measure, of the California State Lottery Act of 1984. (Gov. Code, § 8880 et seq.) Indeed, several forms of institutionalized legal gambling in California predate *Hamilton*, including pari-mutuel horse racing (Bus. & Prof. Code, § 19400 et seq.) and draw poker clubs (by the omission of draw poker from the list of games proscribed by Penal Code section 330), which are now subject to registration with the Attorney General (Bus. & Prof. Code, § 19800 et seq.). This state of affairs led one California court to observe, in requiring relief on a contract for the sale of a Nevada casino, that "Californians cannot afford to be too pious about this matter of gambling." (*Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc.* (1961) 194 Cal.App.2d 177, 180 [14 Cal.Rptr. 805].)

This brings us to *Crockford's Club Ltd.* v. *Si-Ahmed* (1988) 203 Cal.App.3d 1402 [250 Cal.Rptr. 728]. In that case, Smail Si-Ahmed passed bad checks to an English casino in exchange for tokens, which he then lost at gambling. The casino obtained a default judgment against Si-Ahmed in England, and then obtained a default judgment in California enforcing the English judgment. On appeal, Si-Ahmed argued that gambling debts are unenforceable in California as against public policy. The court rejected this argument, noting that casino gambling is legal in England and concluding that "[i]n view of the expanded acceptance of gambling in this state as manifested by the introduction of the California lottery and other innovations [citation], it cannot seriously be maintained that enforcement of said judgment 'is so antagonistic to California public policy interests as to preclude

the extension of comity in the present case.' " (*Id.* at p. 1406, quoting *Wong v. Tenneco, Inc., supra,* 39 Cal.3d at p. 136.)

The posture of *Crockford's Club* is similar to that of the present case in that both turn on the question of public policy in California. The California action in *Crockford's Club* was to enforce a foreign nation judgment, which, unlike a sister state judgment, is not entitled to full faith and credit. Like a sister state cause of action, a foreign nation judgment may be refused enforcement if the underlying cause of action is contrary to the public policy of California. (Code Civ. Proc., § 1713.4, subd. (b)(3); see Rest.2d, Conf. of Laws, § 117, com. c.)

The court in *Crockford's Club* did not specifically address the question whether enforcement of gambling debts is still against public policy in California. Indeed, the court did not even discuss the *Hamilton* rule or mention any of the other California cases on point. The court simply relied on California's "expanded acceptance" of gambling *itself* as indicating enforcement of the English judgment was not against public policy. (*Crockford's Club Ltd.* v. *Si-Ahmed, supra,* 203 Cal.App.3d at p. 1406.)

It cannot be denied that California's historical public policy against gambling has been substantially eroded. Pari-mutuel horse racing, draw poker clubs, and charitable bingo games have proliferated throughout the state. These forms of gambling are indulged by a relatively small segment of the population, but the same cannot be said of the California State Lottery, which was passed by initiative measure and has become firmly rooted in California's popular culture. Lottery tickets are now as close as the nearest convenience store, turning many Californians into regular gamblers. The "thirst for play" of Californians, as noted in 1853 in *Carrier* v. *Brannan, supra,* 3 Cal. at page 329, has not abated. If it was true as observed in 1961 that "Californians cannot afford to be too pious about this matter of gambling" (*Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc., supra,* 194 Cal.App.2d at p. 180), then all the more so in 1993 would expressions of piety on the subject ring hollow. On this score, the *Crockford's Club* decision has a point.

But the court in *Crockford's Club* failed to draw the critical distinction between public acceptance of gambling itself and California's deep-rooted policy against enforcement of gambling debts—that is, gambling *on credit.* While the public policy against the former has been substantially eroded, the public policy against the latter has not.

This is because California's rule against enforcing gambling debts has never depended upon the criminalization of gambling itself. At the inception

of the rule in the early 1850's, in *Bryant* v. *Mead, supra,* 1 Cal. 441, and *Carrier* v. *Brannan, supra,* 3 Cal. 328, licensed gaming houses were statutorily sanctioned. As the Supreme Court observed in both cases, the licensing of a gaming house did not make enforceable a gambling debt incurred there. (*Carrier* v. *Brannan, supra,* 3 Cal. at p. 329; *Bryant* v. *Mead, supra,* 1 Cal. at p. 444.) In 1948, the matter of gambling debts incurred at legal gaming houses was revisited, and the prohibition against enforcement reaffirmed, in *Lavick* v. *Nitzberg, supra,* 83 Cal.App.2d 381.

Indeed, the prohibition against legalized gambling on credit goes all the way back to 1710 in the Statute of Anne, which permitted gambling "at the palaces of St. James, or Whitehall when the sovereign is in residence" but limited such gambling to "ready money only." (9 Anne, ch. 14, § 9.)

Thus, it matters little that gambling itself has become more accepted in California. The cornerstone of the *Hamilton* rule against enforcement of gaming house debts is not simply that the game played is unlawful, but that the judiciary should not encourage gambling *on credit* by enforcing gambling debts, whether the game is lawful or not.

This distinction between gambling itself and gambling on credit was elucidated in *King International Corp.* v. *Voloshin* (1976) 33 Conn. Supp. 166 [366 A.2d 1172]. The defendant in that case stopped payment on a check given in exchange for chips at a licensed casino in Aruba, and the casino's owner sued in Connecticut to enforce the debt. The court refused enforcement, concluding that despite Connecticut's embrace of various forms of legalized gambling such as pari-mutuel racing, jai alai and a state lottery, "Connecticut has never deviated from its ancient prohibition of gambling on credit." (366 A.2d at p. 1174, fn. omitted.) The court explained, "It is not incongruous for a legislature to sanction certain forms of gambling and still to refuse the collection of gambling debts. . . . [¶] While the state's heretofore ancient and deep-rooted policy condemning gambling has been eroded to some degree by its legalization of certain types of gambling, the state has, nevertheless, been intransigent in its policy prohibiting the extension of credit for the promotion of gambling activity—and with good reason. One need not have the gambling sagacity of the famed Las Vegas oddsmaker Jimmy the Greek to recognize the potential dangers in the extension of credit to the gambler or the possibly unfortunate incidents, to employ a euphemism, that could well result from the nonpayment of the gambling bettor to his creditor." (366 A.2d at pp. 1174-1175; accord, *Casanova Club* v. *Bisharat* (1983) 189 Conn. 591 [458 A.2d 1, 4].)

Courts in other jurisdictions have similarly concluded that a shift in public policy with regard to gambling itself, for example through the advent of

legalized forms of gambling such as lotteries, is not inconsistent with a continued public policy against gambling on credit. (E.g., *Carnival Leisure Industries, Ltd.* v. *Aubin* (5th Cir. 1991) 938 F.2d 624, 626 [Texas]; *Resorts International, Inc.* v. *Zonis* (N.D.Ill. 1984) 577 F.Supp. 876, 878-879.) "Even while legal gambling spreads throughout the country, the public policy of virtually every state makes legal gambling debts unenforceable, treating a casino marker the same as a contract for prostitution." (Rose, *Gambling and the Law—Update 1993* (1992) 15 Hastings Comm. & Ent. L.J. 93, 95.)

There is a special reason for treating gambling on credit differently from gambling itself. Gambling debts are characteristic of pathological gambling, a mental disorder which is recognized by the American Psychiatric Association and whose prevalence is estimated at 2 to 3 percent of the adult population. (Diagnostic & Statistical Manual of Mental Disorders (3d ed. rev. 1987) pp. 324-325.) "Characteristic problems include extensive indebtedness and consequent default on debts and other financial responsibilities, . . . and financially motivated illegal activities to pay for gambling." (*Id.* at p. 324.) Having lost his or her cash, the pathological gambler will continue to play on credit, if extended, in an attempt to win back the losses.

Pathological gambling is to be distinguished from "social gambling," where "acceptable losses are predetermined." (Diagnostic & Statistical Manual of Mental Disorders, *supra*, p. 324.) The social gambler comes prepared to leave the game with an empty wallet or purse, but not with a heavy debt. In contrast, the pathological gambler is out of control, risking extensive debt and possibly financial ruin—perhaps even "unfortunate incidents, to employ a euphemism." (*King International Corp.* v. *Voloshin, supra*, 366 A.2d at p. 1175.)

In our view, this is why enforcement of gambling debts has always been against public policy in California and should remain so, regardless of shifting public attitudes about gambling itself. If Californians want to play, so be it. But the law should not invite them to play themselves into debt. The judiciary cannot protect pathological gamblers from themselves, but we can refuse to participate in their financial ruin.

Curiously, the statutes permitting limited forms of gambling in California do not specifically address whether such gambling may be done on credit. Arguably, the Horse Racing Law requires pari-mutuel gambling to be on a cash-only basis, since it permits wagering "by contributing . . . *money* to the parimutuel pool . . . ." (Bus. & Prof. Code, § 19594, italics added; see *Carnival Leisure Industries, Ltd.* v. *Aubin, supra*, 938 F.2d at p. 626, fn. 4 [Texas statute permitting race wagering "by contributing money to the

pari-mutuel pool" interpreted as referring only to United States currency].) But the California State Lottery Act of 1984 (Gov. Code, § 8880 et seq.) contains no provisions against the purchase of lottery tickets with a check or credit card. The Gaming Registration Act, which became operative in 1984 and requires registration of establishments where legal games such as draw poker are played, defines "legal gambling or gaming" as "any card game played for currency, check, credit or any other thing of value" which is not made unlawful by the Penal Code or local ordinance. (Bus. & Prof. Code, § 19802.)

Does the California State Lottery Act or the Gaming Registration Act alter our state's public policy against gambling on credit? We think not.

The lottery law is narrow in scope, expressly stating that it shall not be construed to repeal or modify existing state law regarding the prohibition of gambling other than the state lottery. (Gov. Code, § 8880.2.) If lottery tickets may be purchased with a check or credit card, that fact cannot change the law on enforcement of nonlottery gambling debts.

The reference in the Gaming Registration Act to legal card games "played for currency, check, credit or any other thing of value" might, at first blush, appear to suggest a departure from the long-established rule against enforcement of gambling debts incurred in California at licensed gaming houses. (*Carrier* v. *Brannan, supra*, 3 Cal. 328; *Bryant* v. *Mead, supra*, 1 Cal. 441; *Lavick* v. *Nitzberg, supra*, 83 Cal.App.2d 381.) But there is no indication whatsoever that this was the intent of the Legislature. The express purpose of the Gaming Registration Act was simply to give the state concurrent jurisdiction with local governments over legal gaming houses "and to provide uniform, minimum regulation of the operation of those establishments through registration by the Attorney General of those who own or manage gaming clubs." (Bus. & Prof. Code, § 19801.) Nothing in the legislative history of the act suggests the Legislature intended to alter the rule against enforcement of gambling debts. (See generally *Fendrich* v. *Van de Kamp* (1986) 182 Cal.App.3d 246, 253-255 [227 Cal.Rptr. 262].)

A glance at Penal Code section 330 explains the reference to checks and credit in the Gaming Registration Act. Section 330 prohibits specified games played "for money, checks, credit, or other representative of value . . . ." Obviously, the reference to "currency, check, credit or any other thing of value" in the Gaming Registration Act was drawn from Penal Code section 330. The reference appears to be nothing more than the product of an effort to distinguish lawful card games from those made unlawful by section 330.

Nothing suggests a broader purpose to authorize judicial enforcement of gambling debts.

A similar conclusion was reached in *West Indies* v. *First Nat. Bank of Nevada, supra,* 214 P.2d at pages 152-153, a case predating the 1983 Nevada statute permitting enforcement of gambling debts. In *West Indies,* the Nevada Supreme Court concluded that the 1931 statute legalizing gambling in Nevada, which prohibited the operation of games "for money [,] '. . . property, checks, credit, or any representative of value' " without having first procured a license (*id.* at p. 151), did not impliedly authorize suits to collect on checks given in payment for gambling debts: "It cannot be legally inferred from this wording of the statute that the statute is a grant of authority to take checks in properly licensed games, and that there is a corrollary [*sic*] power granted to maintain an action at law for the collection of such checks." (*Id.* at p. 153.)

We conclude that California's strong public policy against enforcement of gambling debts remains unaffected by increased public tolerance of gambling itself or by the limited legalization of certain forms of gambling in this state. That public policy is so fundamental and deep-rooted as to justify our refusal to enforce a sister state cause of action. (*Wong* v. *Tenneco, Inc., supra,* 39 Cal.3d at p. 135; *Knodel* v. *Knodel, supra,* 14 Cal.3d at p. 765, fn. 15; *Loucks* v. *Standard Oil Co., supra,* 120 N.E. at p. 202.)

We therefore reaffirm the commitment of the California courts to the *Hamilton* rule: "The owner of a gambling house who honors a check for the purpose of providing a prospective customer with funds with which to gamble and who then participates in the transaction thus promoted by his act cannot recover on the check." (*Hamilton* v. *Abadjian, supra,* 30 Cal.2d at p. 52.) If a licensed owner of a Nevada casino wishes to recover on a check or memorandum of indebtedness given by a California resident under such circumstances, the owner will have to obtain a Nevada state court judgment (see Nev. Rev. Stat. Ann. § 14.605 (Michie 1991) [long-arm jurisdiction]), which will then be entitled to full faith and credit in California regardless of our public policy. (*Harrah's Club* v. *Van Blitter, supra,* 902 F.2d at p. 777; see also *Hilton Intern. Co.* v. *Arace* (1977) 35 Conn. Supp. 522 [394 A.2d 739, 743-744].)

## IV. Disposition

The judgment of the municipal court is affirmed.

Peterson, P. J., and Haning, J., concurred.