[No. D028362. Fourth Dist., Div. One. May 19, 1999.]

DAVID M. KELLY et al., Plaintiffs and Appellants, v.
FIRST ASTRI CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Incorvaia & Associates, Joel L. Incorvaia and Anna M. Mueller for Plaintiffs and Appellants.

Law Offices of Anton N. Handal, Marianne S. Johnson and Anton N. Handal for Defendants and Respondents.

## OPINION

**NARES, Acting P. J.**—Plaintiffs David M. Kelly, David R. Smith, and Dominick Spinale (collectively Kelly) appeal from a summary judgment in favor of defendants First Astri Corporation, Stanley Dru, and Ricci La Brake (collectively respondents) on Kelly's fourth amended complaint for recovery of gambling losses at the Sycuan Gaming Center (the Sycuan Casino) located on the Sycuan Indian Reservation. Kelly, while providing the "bank" for card games of "twenty-one" (hereafter referred to as either twenty-one or blackjack[1]), allegedly suffered gambling losses in the approximate sum of $120,000 when respondents, as managers and employees of the Sycuan Casino, intentionally or negligently allowed the placement of "marked" cards in the decks used by certain blackjack dealers, thereby giving card-players participating in the alleged cheating scheme a substantial winning advantage over the dealer in each game in which the "marked" cards were used. Penal Code[2] section 330 proscribes (among other things) the playing, carrying on, or conducting for money of games of twenty-one and "any banking . . . game played with cards . . . ."

The principal issue presented is whether on the undisputed material facts of this case, and in the absence of a statutory right to recover his alleged gambling losses, Kelly's action is barred as a matter of California law and public policy.

We conclude that Kelly's action is barred, absent a statutory right to recover his alleged gambling losses, under California's strong and long-standing public policy against judicial resolution of civil claims arising out of lawful or unlawful gambling contracts or transactions that applies both to actions for recovery of gambling losses and actions to enforce gambling debts, regardless of whether the form of blackjack, Sycuan 21, in which he participated at the Sycuan Casino on Indian lands is lawful in California, or lawful on Indian lands under federal Indian gaming law.[3]

We also conclude that Sycuan 21 is proscribed by section 330, even if the playing of that game at the Sycuan Casino were lawful under federal Indian gaming law, and thus Kelly's claims are barred as a matter of California law

---

[1]Blackjack is defined as, "a card game the object of which is to be dealt cards having a higher count than those of the dealer up to but not exceeding 21—called also *twenty-one, vingt-et-un.*" (Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 119.)

[2]Subsequent references to section 330 are to Penal Code section 330.

[3]See the Indian Gaming Regulatory Act of 1988 (25 U.S.C. § 2701 et seq.) and implementing regulations (25 C.F.R. § 501.1 et seq. (1998)), discussed, *post.*

and public policy on the additional ground the parties were in pari delicto[4] during their participation in the allegedly "rigged" games of Sycuan 21. We further conclude that Kelly's claims are barred under California's in pari delicto doctrine for the additional reason that, under federal Indian gaming law, Sycuan 21 is a form of class III gaming that is illegal on California Indian lands because it is illegal in California. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

The material facts on which the court granted summary judgment in favor of respondents are undisputed.

### A. *The Parties and Kelly's "Banking" of Blackjack*

The Sycuan Casino is located on the Sycuan Indian Reservation near the City of San Diego, and is owned by the Sycuan Band of Mission Indians (Sycuan Band).[5] Defendant and respondent First Astri Corporation (Astri), an Illinois corporation, entered into a cardroom managing agreement with the Sycuan Band under which Astri, as the managing agent of the Sycuan Casino, assumed responsibility for its day-to-day operation. Defendant and respondent Stanley Dru, a resident of Arizona, was the sole shareholder and chairman of Astri. Defendant and respondent Ricci La Brake, a Sycuan Band tribal member employed by Astri, was the general manager of the Sycuan Casino. Defendant Ollie Norton (Norton), the cardroom manager employed by the Sycuan Band, was responsible for the day-to-day operations of the high stakes blackjack pit area of the Sycuan Casino, including all card control procedures and all cardroom rules regarding the "banking" of games of blackjack.

Beginning in late 1993 and continuing through the middle of 1994, Kelly pooled financial resources and "banked" games of twenty-one at the Sycuan Casino by financially backing the dealer. In exchange for paying all of the dealer's losses to the players of twenty-one, Kelly received all of the dealer's winnings. Astri and the Sycuan Casino profited from the playing of twenty-one by charging each "banker" a fee of 50 cents per hand.

### B. *Kelly's Alleged "Marked" Cards Gambling Losses*

In May 1994, while acting as "banker" during two games of twenty-one played against two named defendants (not parties to this appeal) at the

---

[4]The term "in pari delicto" is defined as, "In equal fault; equally culpable or criminal; in a case of equal fault or guilt." (Black's Law Dict. (5th ed. 1979) p. 711.)

[5]The Sycuan Band was originally named as a defendant in this action, but was dismissed under the doctrine of sovereign immunity.

Sycuan Casino, Kelly allegedly suffered combined gambling losses in the total approximate sum of $120,000. Based on the playing style of the player in the second game, Kelly concluded the player was able to read the "top" (or next) card the dealer dealt out of the card shoe, and thereby gain an advantage that led to Kelly's gambling losses.

Kelly continued to "bank" card games at the Sycuan Casino in order to determine whether "marked" cards were being used, and by June 1994 he became convinced cheating with "marked" cards was occurring there. Kelly further claimed he discerned darkened lines down the vertical sides on the 9, 10, and "10-value" cards, and that these markings were visible to the players when the top card was dealt from the shoe. Norton, the cardroom manager, testified at his deposition that in 1993 some of the cards were marked with a little red triangle in the middle of each such card, and these markings were visible to the players as the cards were dealt out of the shoe.

The alleged "marked" card cheating at the Sycuan Casino became public after an investigation when the Sycuan Band terminated the employment of a number of cardroom dealers, pit bosses and other employees, including Norton, the cardroom manager.

### Procedural Background

#### A. *Kelly's Fourth Amended Complaint and Respondents' Answer*

In his operative fourth amended complaint for recovery of gambling losses, Kelly alleged causes of action for intentional misrepresentation and fraudulent concealment, conversion, money had and received, negligence, negligent supervision, and civil conspiracy. The amended complaint alleged that Kelly and other plaintiffs not parties to this appeal suffered gambling losses in the total approximate sum of $200,000[6] while "banking" the "rigged" games of twenty-one at the Sycuan Casino, plus the loss of gambling profits they "should have obtained" by "banking" the card dealers, when respondents, as managers and employees of the Sycuan Casino, intentionally or negligently allowed the placement of "marked" cards in the decks used by certain blackjack dealers, thereby giving two named cardplayers participating in the alleged cheating scheme a substantial winning advantage over the dealer in each game in which the "marked" cards were used.

Respondents' answer to the amended complaint denied all of Kelly's allegations, and asserted in the 12th affirmative defense that Kelly's action was barred and unenforceable under section 330.

---

[6]Kelly's alleged gambling losses in the approximate sum of $120,000 do not include the alleged losses of other plaintiffs who are not parties to this appeal.

### B. *Summary Judgment in Favor of Respondents*

In December 1996, respondents filed a motion for summary judgment or, alternatively, for summary adjudication. Respondents argued (among other things) that Kelly's entire action was barred on the grounds the undisputed material facts established that Kelly had participated in illegal blackjack games prohibited in California under section 330, Kelly was in pari delicto with respondents by participating in those games, and Kelly's claims were thus barred by California public policy. Following oral argument, the court issued an order confirming its telephonic ruling granting respondents' summary judgment motion on the grounds the "sister state"[7] causes of action alleged in Kelly's amended complaint were barred and unenforceable under California public policy as a matter of law.

On March 3, 1997, the court entered judgment in favor of respondents. Kelly's timely appeal followed.

### STANDARD OF REVIEW

In evaluating the propriety of a grant of summary judgment our review is de novo, and we independently review the record before the trial

---

[7]We recognize that a federally recognized Indian reservation is not a "sister state." In *McClanahan* v. *State Tax Comm'n* (1973) 411 U.S. 164, 168 [93 S.Ct. 1257, 1260, 36 L.Ed.2d 129] (*McClanahan*), the United States Supreme Court explained: " '[T]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' [Citation.] This policy was first articulated by this Court 141 years ago when Mr. Chief Justice Marshall held that Indian nations were 'distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States.' [Citation.] It followed from this concept of Indian reservations as *separate, although dependent nations*, that state law could have no role to play within the reservation boundaries. . . ." (Italics added.)

Recently, the high court further explained in *Oklahoma Tax Comm'n* v. *Sac and Fox Nation* (1993) 508 U.S. 114 [113 S.Ct. 1985, 1991, 124 L.Ed.2d 30]: "Our decision in *McClanahan* relied heavily on the doctrine of tribal sovereignty. We found a 'deeply rooted' policy in our Nation's history of 'leaving Indians free from state jurisdiction and control.' [Citation.] Indian nations, we noted, long have been ' "distinct political communities, having territorial boundaries, within which their authority is exclusive." ' [Citations.] The Indian sovereignty doctrine, which historically gave state law 'no role to play' within a tribe's territorial boundaries, [citation], did not provide 'a definitive resolution of the issues,' but it did 'provid[e] a backdrop against which the applicable treaties and federal statutes must be read,' [citations]." (*Id.* at pp. 123-124 [113 S.Ct. at p. 1991].)

We thus recognize the term "sister state" is a misnomer when used in reference to Indian lands. The parties to the instant appeal, like the trial court, characterize the claims alleged in Kelly's amended complaint as "sister state" causes of action. For purposes of our discussion (*post*) of the jurisdictional issues presented in this appeal, we shall also occasionally refer to Kelly's claims as "sister state" causes of action, acknowledging those claims arose on the Sycuan Indian Reservation.

court. (*Branco* v. *Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392] (*Branco*).) In practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment. (*Lopez* v. *University Partners* (1997) 54 Cal.App.4th 1117, 1121-1122 [63 Cal.Rptr.2d 359].)

Under Code of Civil Procedure section 437c,[8] subdivision (c), a motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Because the granting of a summary judgment motion involves pure questions of law, we are required to reassess the legal significance and effect of the papers presented by the parties in connection with the motion. (*Ranchwood Communities Limited Partnership* v. *Jim Beat Construction Co.* (1996) 49 Cal.App.4th 1397, 1408 [57 Cal.Rptr.2d 386] (*Ranchwood*).)

We apply the same three-step analysis required of the trial court in ruling on a motion for summary judgment. (*Ranchwood, supra,* 49 Cal.App.4th at p. 1408.) First, we identify the issues framed by the pleadings because the court's sole function on a motion for summary judgment is to determine from the submitted evidence whether there is a "triable issue as to any material fact." (§ 437c, subd. (c).) To be "material" for purposes of a summary judgment proceeding, a fact must relate to some claim or defense in issue under the pleadings (*Zavala* v. *Arce* (1997) 58 Cal.App.4th 915, 926 [68 Cal.Rptr.2d 571] (*Zavala*)), and it must also be essential to the judgment in some way (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 3 (The Rutter Group 1998) ¶ 10:271 rev. #1, 1998).

Second, we determine whether the moving party has met its burden of proof under section 437c. (*Zavala, supra,* 58 Cal.App.4th at p. 926.) Where (as here) the defendants are the moving parties, we determine whether they have met their burden under subdivision (*o*)(2) of section 437c of producing admissible evidence showing that a cause of action has no merit because "one or more elements of the cause of action, even if not separately pleaded, cannot be established, or . . . there is a complete defense to that cause of action."

Finally, if the moving party has met its statutory burden and the summary judgment motion prima facie justifies a judgment, we determine whether the opposing party has met its burden under section 437c. (*Zavala, supra,* 58

---

[8]Subsequent references to section 437c are to Code of Civil Procedure section 437c.

Cal.App.4th at p. 926; § 437c, subd. (*o*)(1)-(2).) Where (as here) the plaintiffs are the opposing parties, we determine whether they have met their burden under subdivision (*o*)(2) of section 437c of producing admissible evidence showing that "a triable issue of one or more material facts exists as to that cause of action or a defense thereto." In making this determination, we strictly construe the evidence of the moving parties and liberally construe that of the opponents, and any doubts as to the propriety of granting the motion should be resolved in favor of the parties opposing the motion. (*Branco, supra*, 37 Cal.App.4th at p. 189.)

## DISCUSSION

The principal question presented is whether in the absence of a statutory right to recover his alleged gambling losses, Kelly's action is barred as a matter of California law and public policy.

We hold that California's strong, long-standing public policy regarding gambling is a broad policy against judicial resolution of civil claims arising out of lawful or unlawful gambling contracts or transactions, and in the absence of a statutory right to bring such claims, this policy applies both to actions for recovery of gambling losses and actions to enforce gambling debts. We also hold that the undisputed material facts establish that Kelly's action, absent a statutory right to recover his alleged gambling losses, is barred as a matter of California law and public policy, regardless of whether the form of blackjack, Sycuan 21, in which he participated at the Sycuan Casino on Indian lands, is lawful in California or lawful on Indian lands under federal Indian gaming law.[9]

We further hold that Sycuan 21 is proscribed by section 330, even if the playing of that game at the Sycuan Casino were lawful under federal Indian gaming law, and thus Kelly's claims are barred as a matter of California law and public policy on the additional ground the parties were in pari delicto[10] during their participation in the allegedly "rigged" games of Sycuan 21. Finally, we hold that Kelly's claims are barred under California's in pari delicto doctrine for the additional reason that, under federal Indian gaming law, Sycuan 21 is a form of class III gaming that is illegal on California Indian lands because it is illegal in California.

---

[9]See the Indian Gaming Regulatory Act of 1988 (25 U.S.C. § 2701 et seq.) and implementing regulations (25 C.F.R. § 501.1 et seq. (1998)), discussed in part IV A. of this Discussion section, *post.*

[10]See footnote 4, *ante.*

# I

## Introduction

### A. Kelly's Contentions

Kelly contends the court erred in granting summary judgment in favor of respondents because California public policy does not preclude California courts from adjudicating the "sister state" claims alleged in his amended complaint. Specifically, Kelly contends that (1) the California public policy on which the court based its summary judgment ruling applies only to actions involving either enforcement of gambling debts or the extension of credit for gambling; (2) this public policy does not apply here because the instant case is not an action that involves enforcement of a gambling debt or extension of credit for gambling, but rather is a "sister state" tort action for the recovery of gambling losses resulting from cheating in "rigged" blackjack games that were otherwise lawful under federal law when played at the Sycuan Casino; and (3) the form of blackjack played at the Sycuan Casino is neither a game of twenty-one, nor a "banking" or "percentage" game, within the meaning of section 330, and thus there is no California public policy that operates to deprive Kelly of a California forum in which to litigate his claims. For reasons we shall discuss, we reject Kelly's contentions.

### B. Definitions and Section 330

We begin our analysis with a discussion of relevant terminology and section 330, California's statute prohibiting illegal "gaming." We shall thereafter discuss the nature and history of California's public policy regarding the use of the judicial process in adjudicating gambling-related claims.

#### 1. Categories of gambling

In *Western Telcon, Inc.* v. *California State Lottery* (1996) 13 Cal.4th 475 [53 Cal.Rptr.2d 812, 917 P.2d 651] (*Western Telcon*), the high court recently explained that California law historically has recognized, and continues to recognize, three distinct forms of gambling: " 'The three key forms of gambling are gaming, lotteries and betting. Gaming may be defined as "the playing of any game for stakes hazarded by the players." A lottery may be defined as "a distribution of prizes by lot or chance." Betting may be defined as "promise[s] to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way, and (unlike a lottery) may involve skill or judgment." [Citation.] In the United States, the definition of a lottery usually, but not always, includes the additional

element of "consideration." [Citation.]' " (*Id.* at pp. 484-485, quoting Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling* (1985) 16 Rutgers L.J. 211, 214-215, fn. 8; see also *People* v. *Postma* (1945) 69 Cal.App.2d Supp. 814, 819 [160 P.2d 221], quoting *Commonwealth* v. *Kentucky Jockey Club* (1931) 238 Ky. 739 [38 S.W.2d 987, 994] [" 'Gaming, betting and lotteries are separate and distinct things in law and fact, and have been recognized consistently as calling for different treatment and varying penalties.' "].)

### 2. *Gaming prohibited by section 330*

■ California's statute prohibiting gaming, section 330, was enacted in 1872. (*Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5] (*Sullivan*).) Section 330 both defines and specifies the punishment for illegal gaming, and currently provides: "*Every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, any game of* faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, seven-and-a-half, *twenty-one*, hokey-pokey, *or any banking or percentage game played with cards*, dice, or any device, *for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of those prohibited games, is guilty of a misdemeanor*, and shall be punishable by a fine not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or by both the fine and imprisonment." (Italics added.) Although section 330 specifies a number of illegal games, including the game of twenty-one (or blackjack), it also forbids "any *banking* or percentage game played with cards, dice, or any device . . . ." (Italics added.) Under this statute, "[a]nyone who conducts, plays or bets at any of the listed games for money or other representation of value commits the misdemeanor of illegal gaming." (*Western Telcon, supra,* 13 Cal.4th at p. 482.)

### 3. *"Banking game"*

As we have discussed, section 330 prohibits (among other things) the playing or carrying on, for money, of "any banking . . . game played with cards . . . ." In *Western Telcon, supra,* 13 Cal.4th at page 487, our high state court explained the definition of "banking game": "When one party wagers simultaneously against a number of others on the outcome of a game, the scheme is a called a banked game or, in the words of our statute (§ 330), a 'banking game.' This court first defined the term 'banking game' in *People* v. *Carroll* (1889) 80 Cal. 153, 157-158 [22 P. 129], accepting as 'sufficiently accurate' the definition given by a witness at trial: ' "[A] game conducted by

one or more persons where there is a fund against which everybody has a right to bet, the bank being responsible for the payment of all the funds, taking all that is won, and paying out all that is lost. The fund which is provided for that purpose is generally called the bank, and the person who conducts it the banker." ' With variations in phrasing, this definition has been accepted and applied by California courts in many cases since. (See, e.g., *Tibbetts* v. *Van de Kamp* [1990] 222 Cal.App.3d [389,] 393 [271 Cal.Rptr. 792]; *Sullivan* v. *Fox*[, *supra*,] 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5]; *In re Lowrie* (1919) 43 Cal.App. 564, 566 [185 P. 421].) As succinctly stated in *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 970 [265 P.2d 191]: 'In a banking game the banker or exhibitor pays all the winnings and suffers all the losses; he is the one against the many, which is the supreme test of a banking game.' " (See also 38 C.J.S. (rev. 1996) Gaming, § 2, pp. 95-96.)[11]

Citing *Sullivan, supra,* 189 Cal.App.3d 673, Kelly contends that banked card games played for money are not proscribed "banking" games within the meaning of section 330 "where any person could 'bank' the games at any time (i.e., the bank rotated) and the 'house' at no time banked the games." We reject this contention.

### 4. *Oliver* v. *County of Los Angeles*

In *Oliver* v. *County of Los Angeles* (1998) 66 Cal.App.4th 1397 [78 Cal.Rptr.2d 641] (review den.) (*Oliver*), the Court of Appeal was required to decide as a matter of first impression "whether a gambling game can be a banking game 'if a person other than the "house" were to maintain and operate the "bank." ' " (*Id.* .at p. 1407, quoting its previous decision in *Huntington Park Club Corp.* v. *County of Los Angeles* (1988) 206 Cal.App.3d 241, 250, fn. 6 [253 Cal.Rptr. 408].) *Oliver* specifically involved the issue of whether a new card game called Newjack is a banking game prohibited by section 330. (66 Cal.App.4th at p. 1403.)

---

[11]"A 'banking game" may be defined as a game conducted by one or more persons where there is a fund against which everybody has the right to bet, the bank taking all that is lost by the betters and paying out all that is won by them or all save a percentage which it keeps. It is essentially a game of the one against the many; and the banker or exhibitor must be interested in the result. Sometimes a banking game has been said to be synonymous with 'banking house.' It is distinguished from other games in which the participants bet and settle with one another. [¶] The person who conducts a banking game has been called the 'banker.' [¶] 'Banking house' has been said generally to mean a place where gambling is carried on, and, more specifically, a house carrying on a game of chance which has capital always ready to play, whether the capital is owned or furnished by the house, or made up at the time by the players. The bank is the fund which is provided for the purpose of operating a banking game." (38 C.J.S., *supra*, Gaming, § 2, pp. 95-96, fns. omitted.)

The *Oliver* court noted that under the published rules for Newjack,[12] the casino does not place wagers on this game through the house dealer, who does not participate in the play of the game. (*Oliver, supra,* 66 Cal.App.4th at p. 1407.) The court further noted that the casino's sole source of income from the playing of Newjack is a "collection" fee, which "[a]ccording to the published rules for Newjack . . . is a fee paid to the house by the player-dealer and each opponent for every hand played." (*Id.* at p. 1405, fn. 4.)

The appellants in *Oliver* argued that Newjack is not a banking game because, under the Newjack rules of play, the players each have the option to be the player-dealer for two consecutive hands, after which the option passes to the player on the immediate left; a player can thus decline to be a player-dealer, in which event the option keeps passing to the left until a player accepts the option; and thus a player can only be a player-dealer for more than two consecutive hands if all the other players at the table decline to be player-dealer. (*Oliver, supra,* 66 Cal.App.4th at pp. 1407-1408.)

Rejecting this argument, the *Oliver* court held that "a game will be determined to be a banking game if under the rules of that game, it is possible that the house, another entity, a player, or an observer can maintain a bank or operate as a bank during the play of the game." (*Oliver, supra,* 66

---

[12]The *Oliver* court explained the published rules for Newjack, the object of the game, and the role of the player-dealer: "According to the published rules for Newjack, in each hand of the game there is a player designated as the 'dealer' (hereinafter, the player-dealer). All the other players are the 'opponents' of the player-dealer. The player-dealer is not the same as the 'house dealer.' The latter is an employee of the casino and his or her job is to deal the cards and settle bets. The opponents wager against the player-dealer and try to beat him or her. The player-dealer is permitted to bet as much as he or she wishes, even if this is over the table limit, but the player-dealer does not have to bet a sufficient amount to cover the wagers of the opponents. If the player-dealer does not place a sufficient wager to cover the bet of an opponent, the opponent's wager is returned to him or her and the opponent receives a button which is good for a free 'collection,' unless the opponent 'gets action on any portion of his bet, in which case no free collection is given.' [¶] The object of the game of Newjack is to hold a hand of cards having a collective value as close to, but no greater than, 22 points. Each card has a specific point value. Thus, an ace has a value of 1; a 2 has a value of 2 or 12, according to the choice of the person holding the card; cards 3 through 10 each have a value equal to the face number of the card; and the jack, queen, and king each have a value of 10. [¶] A player-dealer or an opponent with a starting hand of two cards, where one of the cards is a 2 and the other card has a value of 10, wins the hand, unless the other person also has such a hand; then neither wins. Such a hand is called a Newjack. If only the opponent has the Newjack, he or she wins his or her wager plus a bonus payoff ($2 for every $5 wagered). If the player-dealer has a Newjack, he or she wins all original bets, except as against another person with a Newjack. If both the player-dealer and an opponent have cards totaling under 22, the person with the hand value closest to 22 wins; but if they have the same hand value, they tie. If a player-dealer or opponent goes over 22 but the other does not, the other wins. If the player-dealer and opponent are both over 22, the player-dealer wins unless they tie in hand value; then neither wins and the opponent gets his or her wager back." (*Oliver, supra,* 66 Cal.App.4th at p. 1405, fn. omitted.)

Cal.App.4th at p. 1408.) The court in *Oliver* further held that Newjack is a banking game prohibited under section 330. (66 Cal.App.4th at p. 1409.) The court reasoned: "It is the *potential* for a banked game under Newjack's rules, and not the current mode of play, which determines whether Newjack is a banking game." (*Id.* at p. 1408.) The court further explained that this potential for a banked game arises because under the rules of the game it is possible for one player with a significant amount of money to act as a player-dealer for repeated hands: "[I]n Newjack, the player-dealer position does not *have* to rotate among the players. If the other players decline to accept the player-dealer position, one player can act as a player-dealer for repeated hands and such a player need not go broke after a few hands. A player with a significant amount of money to bet can hold the position of player-dealer for a long time, and thus keep the inherent playing advantage for him or herself. The effect would be a banked game because it could then be said of such a player that he or she is 'taking on all comers, paying all winners, and collecting from all losers.' (*Sullivan, supra,* 189 Cal.App.3d at p. 678.)" (*Oliver, supra,* 66 Cal.App.4th at pp. 1408-1409.) In a footnote, the court in *Oliver* emphasized that under the Newjack rules of play "the player-dealers *do* participate in the game and they *do* have an interest in its outcome, which are traits of a banking game." (*Id.* at p. 1408, fn. 5, citing *Sullivan, supra,* 189 Cal.App.3d at pp. 678-679.)

The *Oliver* decision thus stands for the proposition that a card game played for money can be a banking game prohibited by section 330, even when the house does not act as the bank, if under the rules of play it is possible for another entity, a player, or an observer to maintain a bank or operate as a bank during the play of the game. (*Oliver, supra,* 66 Cal.App.4th at p. 1408.)

## II

### California's Broad, Strong Public Policy Against Judicial Resolution of Civil Claims Arising Out of Gambling Contracts or Transactions

The principal issue presented is whether, in the absence of a statute authorizing lawsuits for recovery of gambling losses, California courts must provide Kelly with a forum in which to litigate his "sister state" tort causes of action for recovery of the gambling losses he allegedly suffered as a result of cheating in "rigged" blackjack games that he "banked" at the Sycuan Casino. The determination of whether California courts must provide a forum for such cases depends, in turn, on whether such suits are barred by strong California public policy.

"A forum state must give full faith and credit to a sister state *judgment,* regardless of the forum state's public policy on the underlying

claim. (*Fauntleroy* v. *Lum* (1908) 210 U.S. 230 [52 L.Ed. 1039, 28 S.Ct. 641]; Rest.2d, Conf. of Laws, § 117.) However, the forum state may refuse to entertain a lawsuit on a sister state *cause of action* if its enforcement is contrary to the strong public policy of the forum state. (Rest.2d, Conf. of Laws, § 90; see *Harrah's Club* v. *Van Blitter* (9th Cir. 1990) 902 F.2d 774, 777.)" (*Metropolitan Creditors Service* v. *Sadri* (1993) 15 Cal.App.4th 1821, 1824-1825 [19 Cal.Rptr.2d 646] (*Metropolitan*).)

■ Here, Kelly's action does not seek enforcement of a "sister state" judgment. Rather, as we have discussed, Kelly is attempting to litigate tort causes of action which arose from alleged cheating in a gambling casino located not in the jurisdictional boundaries of the State of California, but on the Sycuan Indian Reservation, a federally recognized Indian reservation[13] located within the geographical boundaries of California. ■ In *California* v. *Cabazon Band of Mission Indians* (1987) 480 U.S. 202 [107 S.Ct. 1083, 94 L.Ed.2d 244], the United States Supreme Court explained: "The Court has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' [citation], and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,' [citation]." (*Id.* at p. 207 [107 S.Ct. at p. 1087].)

■ California has a strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions. As we shall explain, this judicially recognized public policy can be traced back virtually to the inception of statehood. Respondents suggest this public policy applies only to cases involving either extension of credit for gambling or enforcement of gambling debts, and does not apply to the tort action involved in the instant case, which arises out of alleged cheating during lawful gambling in a "sister state" jurisdiction. To explain our conclusion that Kelly's interpretation of California's public policy in this matter is too narrow, we chronologically review the relevant California case law and statutory authorities.

A. *Bryant* v. *Mead*

■ In *Bryant* v. *Mead* (1851) 1 Cal. 441 (*Bryant*), the earliest California case, the defendant lost $4,000 playing an unlawful "banked" card game known as "pharoah" or "faro" in the plaintiff's San Francisco gaming house.

---

[13]See *Pan American Co.* v. *Sycuan Band of Mission Indians* (9th Cir. 1989) 884 F.2d 416, 417 ("The Sycuan Band . . . , a federally recognized Indian tribe, occupies a reservation in San Diego County").

(*Id.* at pp. 441, 443.) The defendant lost the money while playing against the plaintiff, who, as keeper of the unlicensed gaming house, acted as the "banker." (*Id.* at p. 441.) The defendant stopped payment on two checks he gave to the plaintiff as payment for the gambling debt. (*Ibid.*)

The Supreme Court in *Bryant* affirmed the judgment for the defendant on the ground the debt in question arose out of "gaming," and enforcement of such a debt was against public policy. (*Bryant, supra,* 1 Cal. at p. 444.) The high court explained that no action would lie at common law for recovery of money lost in the course of "gaming," which the court defined as the playing of a game that was unlawful because of either the excessive amount of the stake, or the nature of the game. (*Id.* at pp. 442-443.)[14] The *Bryant* court also stated: "Wagers, which tend to excite a breach of the peace, or are *contra bonos mores*,[15] or which are against the principles of sound policy, are illegal; and no contract arising out of any such illegal transaction, can be enforced." (*Id.* at p. 444.)

### B. *Carrier* v. *Brannan*

Two years later, in *Carrier* v. *Brannan* (1853) 3 Cal. 328 (*Carrier*), the Supreme Court reaffirmed the *Bryant* rule against judicial enforcement of gaming debts. In the *Carrier* case, the defendant lost $17,000 in a common gaming house while playing faro against two other cardplayers, who assigned their claim to the plaintiff. (*Id.* at p. 328.) Following its earlier *Bryant* decision that no action will lie to recover money lost at gaming, the high court stated: "It needs no authority or arguments to satisfy this court that the practice of gaming is vicious and immoral in its nature, and ruinous to the harmony and well-being of society." (*Id.* at p. 329.)

---

[14]The *Bryant* court explained: "In *Petersdorff's Abridgment*, [citation] the principle is thus stated: 'By the common law, the playing at cards, dice, &c., when practised [*sic*] innocently and as a recreation, the better to fit a person for business, is not unlawful, but when the playing is, from the magnitude of the stake, excessive, and such as is now understood by the term gaming, it is considered by the law as an offense, being in its consequences mischievous to society.' Oliphant, in his work on Horse Races and Gaming, [citation] sets for[th] the same doctrine somewhat more at large . . . . A court therefore should not aid in enforcing gaming contracts further than is absolutely required by the strict letter of settled and unquestionable law. In *Petersdorff* and *Oliphant*, above cited, a distinction is made between games which are lawful, and games which are unlawful. That such a distinction existed at common law, can scarcely be doubted. The earliest English statutes speak of *unlawful games*, meaning, of course, those which were unlawful at common law. The distinction is between such, on the one hand, as are innocent and recreative in their design and effect, and such, on the other hand, as are pursued as a business and from motives of gain; and this distinction is said to be indicated by the amount at stake, or by the nature of the game. . . ." (*Bryant, supra,* 1 Cal. at pp. 442-443.)

[15]The term "*contra bonos mores*" is defined as, "Against good morals." (Black's Law Dict. (5th ed. 1979) p. 291.)

The *Carrier* court also held that the licensing of gaming houses did not legalize gaming debts: "Neither do we think that gaming debts have been legalized by the operation of the act of the legislature licensing gaming-houses. [¶] The legislature, finding a thirst for play so universally prevalent throughout the State, and despairing of suppressing it entirely, have attempted to control it within certain bounds, by imposing [restrictions] and burdens upon persons carrying on this kind of business. The license simply operates as a permission, and removes or does away with the misdemeanor which existed at common law without changing the character of the contract." (*Carrier, supra,* 3 Cal. at p. 329.)

### C. *Enactment of Section 330, and Civil Code Sections 1607 and 1667*

"As originally enacted in 1872, section 330 prohibited 'any banking game.'" (*Sullivan, supra,* 189 Cal.App.3d at p. 678.) In 1885, the Legislature amended the statute to (among other things) add the game of "twenty-one" to the list of prohibited games, and to prohibit "any banking 'or percentage' game played with cards . . . ." (See Historical Note, 48A West's Ann. Pen. Code (1999 ed.) § 330, p. 25; see also *Sullivan, supra,* 189 Cal.App.3d at p. 678.)

That same year, the Legislature apparently restated the rule of *Bryant* and *Carrier* (discussed, *ante*) in statutory terms by enacting Civil Code sections 1607,[16] which states that consideration for a contract must be lawful, and 1667,[17] under which a contract is unlawful if it is contrary to "an express provision of law," "the policy of express law, though not expressly prohibited," or "good morals."

### D. *Union Collection Co. v. Buckman*

In *Union Collection Co. v. Buckman* (1907) 150 Cal. 159 [88 P. 708] (*Buckman*), the Supreme Court again addressed the issue of whether the courts in California will lend their process to adjudicate actions arising out of gaming contracts or transactions. The high court in *Buckman* once again answered this question in the negative.

---

[16]Civil Code section 1607 provide: "The consideration of a contract must be lawful within the meaning of Section 1667."

[17]Civil Code section 1667 provides:

"That is not lawful which is:

"1. Contrary to an express provision of law;

"2. Contrary to the policy of express law, though not expressly prohibited; or,

"3. Otherwise contrary to good morals."

In *Buckman,* the defendant (Buckman) lost $1,300 while participating in an unspecified "gambling game"[18] and gave the winner (McMahon) three promissory notes that were transferred to the plaintiff's assignor (Reid) for collection. (*Buckman, supra,* 150 Cal. at p. 160.) After Reid commenced an action against Buckman upon one of the notes, the parties entered into a settlement agreement under which Buckman gave four new notes in consideration for dismissal of the action and cancellation of the original three notes. (*Ibid.*) When Buckman defaulted on his payment obligations under the new notes, Reid brought another lawsuit upon two of the new notes, and the parties again settled the matter upon Buckman's execution of two new written instruments promising to pay the sum of $410 plus interest. (*Id.* at pp. 160-161.) When Buckman apparently defaulted again, Reid assigned his rights to the plaintiff, which brought an action upon the new written instruments. (*Id.* at p. 160.) Following a trial, the trial court entered judgment in favor of Buckman on the ground the original notes were based on illegal consideration because Buckman gave them to McMahon solely to evidence an alleged indebtedness for gambling money he lost to McMahon. (*Id.* at p. 161.)

Citing Civil Code sections 1607 and 1667, and its own *Bryant* and *Carrier* decisions (discussed, *ante*), the Supreme Court in *Buckman* affirmed the judgment. (*Buckman, supra,* 150 Cal. at p. 167.) Referring to the original notes from which the collection action arose, the high court concluded that "it is clear that under the settled law of this state the consideration for such notes was *contra bonos mores* and unlawful"; McMahon, the original holder of the notes, could not have recovered upon them; and thus the plaintiff as assignee and holder of the renewal notes also could not recover. (*Id.* at pp. 161-162.)

E. *Wallace* v. *Opinham*

In 1946, the breadth of the California public policy against judicial resolution of disputes arising out of gambling contracts or transactions was made clear in *Wallace* v. *Opinham* (1946) 73 Cal.App.2d 25 [165 P.2d 709] (*Wallace*). In *Wallace,* the plaintiff alleged in his complaint that he had lost the sum of $9,250 when the defendant defrauded him by using a deck of "marked cards" in a game of twenty-one prohibited by section 330. (73 Cal.App.2d at p. 25.) The plaintiff appealed from a judgment of dismissal after the trial court sustained the defendant's demurrer without leave to amend. (*Ibid.*)

On appeal, the plaintiff contended he was not in pari delicto with the defendant, and thus he had the right to maintain his action to recover the

---

[18]The high court in *Buckman* referred to "gambling game" rather than to "gaming" and to "gambling debt" rather than to "gaming debt." (*Buckman, supra,* 150 Cal. at pp. 160-161.)

money of which he had been defrauded. (*Wallace, supra,* 73 Cal.App.2d at pp. 25-26.) The Court of Appeal disagreed. Noting that the game of twenty-one was specifically prohibited by section 330, and the plaintiff had lost the money while he and the defendant were voluntarily engaged in that unlawful game, the *Wallace* court affirmed the judgment of dismissal, concluding that the plaintiff's complaint showed he "could not prove the alleged fraud and deceit, by means of which he lost his bets, without evidence that the fraud was exercised incident to his participation in [a] game of cards which is prohibited by statute," and thus the parties were in pari delicto with respect to their unlawful playing of blackjack. (*Wallace, supra,* 73 Cal.App.2d at p. 26.) The *Wallace* court further held: "Where the parties voluntarily engage in a gambling game which is prohibited by law, *in the absence of a statute authorizing a recovery of gambling losses,* neither courts of law nor equity will aid or assist either party to enforce rights growing out of that illegal transaction." (*Id.* at p. 26, citing *Babcock* v. *Thompson* (1826) 20 Mass. (3 Pick.) 446, and 38 C.J.S. § 29, p. 99.)

The *Wallace* court further explained (quoting from 38 C.J.S. § 29, p. 99)[19]: " 'In substantially all jurisdictions gambling contracts are treated as unenforceable; and generally, in the absence of a statute providing for recovery or relief, the court will not, at law or in equity, . . . aid or assist either party to a gambling contract or *transaction* to enforce any right or claim against the other growing out of the contract or *transaction,* but will leave the parties where they have placed themselves and the court finds them. Even though a party to an illegal betting contract seeks alleged rights against a third person, the court will not aid him where he must rely on the illegal contract.' (Citing *Kyne* v. *Kyne* [(1940)] 16 Cal.2d 436 [106 P.2d 620].[20])" (*Wallace, supra,* 73 Cal.App.2d at p. 26, italics added.) The *Wallace* court also quoted from

---

[19]See also 38 Corpus Juris Secundum (rev. 1996) Gaming, section 40, page 157 ("Generally, at present, gambling contracts are treated as unenforceable; and generally, in the absence of a statute providing for recovery or relief, the court will not, at law or in equity, . . . aid or assist either party to a gambling contract or transaction to enforce any right or claim against the other growing out of the contract or transaction, but will leave the parties where they have placed themselves and the court finds them. [¶] Even though a party to an illegal betting contract seeks alleged rights against a third person, the court will not aid him where he must rely on the illegal contract. [Fns. omitted.].")

[20]In *Kyne* v. *Kyne* (1940) 16 Cal.2d 436 [106 P.2d 620] (*Kyne*), the California Supreme Court reversed a judgment for the respondents, whose third party claims involved title to money illegally wagered on the outcome of the voting for gubernatorial and senatorial candidates during the General Election held in California on November 8, 1938. (*Id.* at pp. 437-438.)

The high court in *Kyne* stated: "The general rule is that the courts will not recognize such an illegal contract and will not aid the parties thereto, but will leave them where it finds them. This rule has been rigidly enforced in this state to deny any relief in the courts to parties seeking to recover either their stakes or their winnings under a wagering contract which is in violation of law, whether the party against whom the relief was sought was a party to the

*Babcock* v. *Thompson, supra,* 20 Mass. (3 Pick.) 446, in which judgment of nonsuit was entered against the plaintiff in an action to recover gambling losses: " 'The court is of the opinion that the action cannot be maintained. We have no doubt, that according to the general policy and laws of this commonwealth, all gaming is unlawful; and the plaintiff cannot maintain this action, where he is obliged to show his illegal act as the foundation for a recovery. . . . Where a party acts illegally, he is to suffer the loss of his money as the consequence, if the money is sought to be recovered, *except where he may have a remedy under the particular provisions of some statute. Here is a case of gaming accompanied with cheating.* Clearly if the gaming had been fair, the law would give no remedy. *The only question then is, whether the fraud will alter the case.* We think it will not. If a man thus voluntarily puts himself in a condition to be cheated, through his illegal act he cheats the government, and the other person cheats him, and they must be left to settle the affair between themselves.' (Italics added.)" *(Wallace, supra,* 73 Cal.App.2d at p. 27.)

The *Wallace* court reasoned further: "On principle, the California cases are in accord with the preceding cases. No California statute authorizes a party to an illegal transaction which is prohibited by law to recover gambling losses, regardless of the fact that one of them may have been the victim of fraud or deceit with respect to some incident to that illegal transaction. It has been frequently decided that courts will not become the arbiters of incidental acts of participants in gambling games which are prohibited by law. . . . *Public policy prompts courts to decline to distinguish between degrees of turpitude of parties who engage in outlawed transactions. Otherwise courts might be compelled to decide which party cheated the most."* *(Wallace, supra,* 73 Cal.App.2d at p. 27, italics added.)

Finally, citing the high court's decision in *Buckman, supra,* 150 Cal. 159 (discussed, *ante*) and other authorities, the *Wallace* court held: "The California cases are uniform in holding that where money or property is lost in a transaction between the parties which is prohibited by law, neither of the parties has standing in a court of law or equity to recover his losses. [Citations.]" *(Wallace, supra,* 73 Cal.App.2d at pp. 28-29.)

 The *Wallace* decision thus made clear that California's strong public policy against the use of the judicial process of the courts in this state to resolve gambling-related disputes applies not only to actions to enforce gambling debts, but also to tort actions for the recovery of gambling losses resulting from alleged cheating in "rigged" blackjack games and other forms

---

wager or a stakeholder for the parties to the wager. [Citations.]" *(Kyne, supra,* 16 Cal.2d at p. 438.)

of gambling in California. *Wallace* also stands for the proposition that, in the absence of a statute authorizing a recovery of gambling losses, the courts in California will effectuate this broad public policy by refusing to lend their process to adjudicate actions for enforcement of claimed rights arising out of gambling transactions. (*Wallace, supra,* 73 Cal.App.2d at p. 26.)

F. *Hamilton* v. *Abadjian*

■■■ In *Hamilton* v. *Abadjian* (1947) 30 Cal.2d 49 [179 P.2d 804] (*Hamilton*), following the legalization of gambling in the State of Nevada, the California Supreme Court cited with approval the *Wallace* decision and its own prior holdings in *Bryant* and *Carrier* (discussed, *ante*). (*Hamilton, supra,* at pp. 51-52.) *Hamilton* involved an action by the assignee for collection of a Nevada hotel and casino that received six checks in the total amount of $11,450 from a California resident who used part of the proceeds to finance his gambling at a casino blackjack table, and then stopped payment on the checks upon his return to California. (*Id.* at pp. 50-51.) The trial court entered a judgment on a jury verdict that awarded only $5,000 to the plaintiff, and denied recovery on the checks that were honored at the blackjack table and used to finance gambling. (*Id.* at pp. 49-52.)

Citing with approval its own *Bryant, Carrier,* and *Buckman* decisions (discussed *ante*), as well as the intermediate appellate decision in *Wallace* (among numerous other authorities), the high court in *Hamilton* affirmed the judgment and held: "Although gambling is licensed in Nevada, the courts of that state follow the general rule, which prevails in California, and refuse to lend their process to recover losses in gambling transactions of the type here involved. [Citations.]" (*Hamilton, supra,* 30 Cal.2d at pp. 51-52.) *Hamilton* thus· reaffirmed the California rule that, in the absence of a statute authorizing recovery of gambling losses, and as a matter of strong public policy, the courts in California will refuse to lend their process to adjudicate actions arising out of gambling transactions.

G. *Lavick* v. *Nitzberg*

Shortly after our high court decided *Hamilton* (discussed, *ante*), the Court of Appeal in *Lavick* v. *Nitzberg* (1948) 83 Cal.App.2d 381 [188 P.2d 758] (*Lavick*) affirmed a judgment denying recovery to the owner of a California gambling establishment who sued on four checks totaling $2,000 that the defendant gave to purchase chips lost at draw poker, which was a *lawful* game in California. (*Id.* at p. 382.) The *Lavick* court reasoned that even though draw poker is not declared illegal by section 330 (discussed, *ante*), which lists the types of gaming that are punishable as misdemeanors, the

determination of what constitutes an unlawful contract is governed by Civil Code section 1667, and that statute (also discussed, *ante*) establishes that a contract founded upon a gambling consideration is against public policy and contrary to good morals under Civil Code section 1667. (*Lavick, supra,* 83 Cal.App.2d at pp. 382-383.)

Concluding the plaintiff could not recover on the checks given by the defendant, the *Lavick* court stated that ". . . promissory notes given in a gaming-house to the keeper of the house for the purpose of enabling the maker to participate in any game of chance with the keeper or his employees are unenforceable under the provisions of section 1667 of the Civil Code." (*Lavick, supra,* 83 Cal.App.2d at pp. 383-384.) The *Lavick* decision is significant because it illustrates that California's strong public policy against judicial resolution of civil claims arising out of gambling contracts or transactions does not depend on the criminalization of gambling itself.

## H. *Tokar* v. *Redman*

In *Tokar* v. *Redman* (1956) 138 Cal.App.2d 350 [291 P.2d 987] (*Tokar*), an action for damages and declaratory relief, the plaintiff alleged in his complaint that he was a judgment creditor to whom one of the defendants (Redman) became indebted in a sum exceeding $3,000. (*Id.* at p. 352.) The plaintiff also sued the operator of a gambling establishment (Normandie Club), alleging that Redman, while indebted to the plaintiff, gambled away a sum in excess of $3,000 while participating in various gambling games, including blackjack, at the Normandie Club, and thereby became insolvent and unable to pay his debt to the plaintiff. (*Ibid.*) The plaintiff further alleged the Normandie Club should not be permitted to profit at the expense of the plaintiff and Redman's other creditors. (*Ibid.*) The trial court dismissed the action following the plaintiff's refusal to amend his complaint after the court sustained Normandie Club's demurrer with leave to amend, and the plaintiff appealed from the judgment of dismissal. (*Id.* at pp. 351-352.)

The Court of Appeal in *Tokar* affirmed the judgment of dismissal, holding (among other things) that the plaintiff's playing for money of blackjack and other gambling games (some of which were not illegal under § 330) was "unlawful as contrary to the policy of express law and good morals." (*Tokar, supra,* 138 Cal.App.2d at p. 354, citing Civ. Code, § 1667 (discussed, *ante*), and *Lavick, supra,* 83 Cal.App.2d 381.)

## I. *Lane & Pyron, Inc.* v. *Gibbs*

The case of *Lane & Pyron, Inc.* v. *Gibbs* (1968) 266 Cal.App.2d 61 [71 Cal.Rptr. 817] (*Lane*) involved an action by an assignee to collect on five

"bad" checks totaling $1,900 that the defendant cashed at a Nevada casino. (*Id.* at p. 63.) Noting that a "sister state" cause of action will not be enforced in California if it "offends deeply held notions of local public policy," the *Lane* court cited *Hamilton, supra,* 30 Cal.2d 49, for the proposition that ". . . the courts of Nevada as well as California refuse to lend their process to the collection of gambling losses," and concluded that "California's rejection of such claims is an application of Nevada law as well as domestic public policy." (*Lane, supra,* 266 Cal.App.2d at p. 65.)

The *Lane* court noted in a footnote the plaintiff's argument that various forms of gambling, such as pari-mutuel wagering and draw poker, were permitted under California law, and that an intermediate appellate court in *Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc.* (1961) 194 Cal.App.2d 177, 180 [14 Cal.Rptr. 805] (*Nevcal*), had stated: " 'In these modern days Californians cannot afford to be too pious about this matter of gambling.' " (*Lane, supra,* 266 Cal.App.2d at p. 65, fn. 2.) The *Lane* court disagreed with the comment by the *Nevcal* court: "Although granting a measure of logic to such arguments, this intermediate appellate court may not blink at public policy doctrines emanating from a higher tribunal." (*Lane, supra,* 266 Cal.App.2d at p. 65, fn. 2.)

J. *Crockford's Club Ltd.* v. *Si-Ahmed*

In *Crockford's Club Ltd.* v. *Si-Ahmed* (1988) 203 Cal.App.3d 1402 [250 Cal.Rptr. 728] (*Crockford's Club*), the decision upon which Kelly primarily relies, the defendant (Si-Ahmed) was a California resident who passed bad checks to an English casino in exchange for tokens, which he then lost at gambling. The casino obtained a default judgment against Si-Ahmed in England, and then obtained a default judgment in California to enforce the English judgment. (*Id.* at pp. 1404-1406.)

On appeal, Si-Ahmed contended that his gambling debt was unenforceable in California as against public policy. (*Crockford's Club, supra,* 203 Cal.App.3d at p. 1406.) The Court of Appeal in *Crockford's Club* rejected this public policy argument, noting that the events took place in England, a jurisdiction that permitted casino gambling, and concluding: "In view of the expanded acceptance of gambling in this state as manifested by the introduction of the California lottery and other innovations [citation], it cannot seriously be maintained that enforcement of said judgment 'is so antagonistic to California public policy interests as to preclude the extension of comity in the present case.' [Citation.]" (*Id.* at p. 1406.)

Although the *Crockford's Club* decision turned on the question of California public policy, it is significant that the Court of Appeal did not examine

the nature and scope of that public policy, nor did it discuss or even mention the many California cases (discussed, *ante*) that created this public policy. As we shall now discuss, the *Crockford's Club* court's public policy analysis was rejected in *Metropolitan, supra,* 15 Cal.App.4th 1821.

K. *Metropolitan*

Finally,[21] the 1993 decision in *Metropolitan, supra,* 15 Cal.App.4th 1821, involved a collection action by the assignee of a Nevada casino that received from the defendant (Sadri, a California resident) two personal checks and two memoranda of indebtedness in exchange for chips that he lost playing the game of baccarat. (*Id.* at p. 1823.) Sadri stopped payment on the checks and memoranda. (*Ibid.*) When the municipal court in which the action was commenced rendered judgment for Sadri, ruling that his Nevada gambling debts were unenforceable under California public policy, the plaintiff appealed to the appellate department of the superior court, which affirmed the judgment and transferred the matter to the Court of Appeal. (*Id.* at pp. 1823-1824.)

The issue on appeal in *Metropolitan* was whether enforcement in California of Sadri's gambling debts under a Nevada statute allowing such a cause of action was against California public policy. (*Metropolitan, supra,* 15 Cal.App.4th at p. 1824.) The *Metropolitan* court affirmed the municipal court judgment in favor Sadri, holding that "a Nevada cause of action to enforce gambling debts incurred at a casino for the purpose of providing the debtor with funds for gambling violates California's public policy against gambling on credit and thus is unenforceable in this state." (*Id.* at p. 1823.)

Because *Metropolitan* involved an action to enforce a gambling debt, rather than (as in the instant case) an action to recover gambling losses resulting from alleged cheating, the Court of Appeal in *Metropolitan* examined the long line of California decisions that had addressed the enforceability of such debts,[22] and concluded that "California has always had a strong public policy against judicial enforcement of gambling debts, going back virtually to the inception of statehood." (*Metropolitan, supra,* 15 Cal.App.4th

---

[21]In his appellant's reply brief, Kelly cites the recent decision in *Vu* v. *California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229 [68 Cal.Rptr.2d 31], and asserts that "*Vu* stands for the proposition that California courts can and will entertain civil claims for damages arising out of the lawful playing of card games where damages can be proved with reasonable certainty." *Vu* is of no assistance here, however, because it contains no discussion of California's long-standing public policy against judicial resolution of gambling-related claims, and it runs contrary to the historical development of California law in this area.

[22]The *Metropolitan* court reviewed the decisions in *Bryant, Carrier, Buckman, Hamilton, Lavick, Lane, Nevcal, and Crockford's Club,* all of which we have discussed, *ante.* (*Metropolitan, supra,* 15 Cal.App.4th at pp. 1824-1829.)

at p. 1824.) The court did not review *Wallace, supra,* 73 Cal.App.2d 25. Although the court did not discuss its failure to address *Wallace,* such failure can be explained by the fact that *Wallace* involved an action to recover gambling *losses* resulting from alleged cheating during a game of blackjack, whereas *Metropolitan* involved an action to recover a gambling *debt. Wallace* thus was not directly relevant on the facts presented in *Metropolitan.*

The *Metropolitan* court reviewed the *Crockford's Club* decision (203 Cal.App.3d 1402) upon which Kelly primarily relies here. *Crockford's Club* involved (as we have discussed, *ante*) an action to enforce an English judgment that enforced a gambling debt incurred in an English casino. The Court of Appeal in *Metropolitan* disagreed with the holding in *Crockford's Club* that the English gambling debt judgment was enforceable in California, stating: "The posture of *Crockford's Club* is similar to that of the present case in that both turn on the question of public policy in California. The California action in *Crockford's Club* was to enforce a foreign nation judgment, which, unlike a sister state judgment, is not entitled to full faith and credit. Like a sister state cause of action, a foreign nation judgment may be refused enforcement if the underlying cause of action is contrary to the public policy of California. [Citations.] [¶] The court in *Crockford's Club* did not specifically address the question whether enforcement of gambling debts is still against public policy in California. Indeed, the court did not even discuss the *Hamilton* rule or mention any of the other California cases on point. The court simply relied on California's 'expanded acceptance' of gambling itself as indicating enforcement of the English judgment was not against public policy. [Citation.]" (*Metropolitan, supra,* 15 Cal.App.4th at p. 1828, italics omitted.)

The court in *Metropolitan* acknowledged that "California's historical public policy against gambling has been substantially eroded" by the proliferation of pari-mutuel horse racing, draw poker clubs, charitable bingo games, the California State Lottery, and other forms of gambling. (*Metropolitan, supra,* 15 Cal.App.4th at p. 1828.) The court, however, criticized the failure of the *Crockford's Club* court to "draw the critical distinction between public acceptance of gambling itself and California's deep-rooted policy against enforcement of gambling debts—that is, gambling *on credit.*" (*Metropolitan, supra,* 15 Cal.App.4th at p. 1828.) The *Metropolitan* court noted that "[w]hile the public policy against the former [i.e., gambling] has been substantially eroded, the public policy against the latter [i.e., enforcement of gambling debts] has not." (*Ibid.*) The court further explained that "it matters little that gambling itself has become more accepted in California. The

cornerstone of the *Hamilton* rule[23] against enforcement of gaming house debts is not simply that the game played is unlawful, but that the judiciary should not encourage gambling on credit by enforcing gambling debts, whether the game is lawful or not." (*Metropolitan, supra,* 15 Cal.App.4th at pp. 1828-1829.)

The *Metropolitan* court concluded that "enforcement of gambling debts has always been against public policy in California and should remain so, regardless of shifting public attitudes about gambling itself. If Californians want to play, so be it. But the law should not invite them to play themselves into debt. The judiciary cannot protect pathological gamblers from themselves, but we can refuse to participate in their financial ruin." (*Metropolitan, supra,* 15 Cal.App.4th at p. 1830.)

The *Metropolitan* decision is thus factually distinguishable because it involved an action to recover a gambling debt, rather than an action to recover gambling losses resulting from alleged cheating. The reasoning of the *Metropolitan* court, however, is relevant to the issues presented by the instant appeal because it drew a "critical distinction" between public acceptance of gambling itself, and California's deep-rooted public policy regarding the enforceability of gambling-related claims. (*Metropolitan, supra,* 15 Cal.App.4th at p. 1828.)

The *Metropolitan* court's articulation of the nature of that public policy as a "deep-rooted policy against enforcement of gambling debts" was necessarily and properly tailored to the narrow facts presented in that case, which involved not an action to recover gambling losses resulting from alleged cheating, but rather an action to enforce gambling debts. However, a review of the relevant California case law and statutory authorities demonstrates that California's public policy in this matter is broader than the expression of that policy set forth in *Metropolitan.* In our view, these authorities establish that California's long-standing public policy regarding gambling is a broad, strong policy against judicial resolution of civil claims arising out of gambling contracts or transactions; and this public policy, absent a statutory right to bring such claims, applies to both actions for recovery of gambling losses and actions to enforce gambling debts. To the extent the decision in *Crockford's Club, supra,* 203 Cal.App.3d 1402, is to the contrary, we decline to follow that decision.

### III

*Kelly's Claims Are Barred as a Matter of Law and Public Policy*

Here, the material facts are not in dispute. Kelly's amended complaint seeks damages for recovery of both gambling losses and lost gambling

---

[23]See the discussion, *ante,* of *Hamilton, supra,* 30 Cal.2d 49.

profits. It is undisputed that Kelly's losses occurred while he was "banking" games of twenty-one at the Sycuan Casino. It is also undisputed that Kelly "banked" those games by collecting from the losers and paying the winners, such that he had a stake in each hand. Kelly claims the blackjack games he "banked" were "rigged" in that respondents, as managers and employees of the Sycuan Casino, intentionally or negligently allowed the placement of "marked" cards in the decks used by certain blackjack dealers, thereby giving two named cardplayers participating in the alleged cheating scheme a substantial winning advantage over the dealer in each game in which the "marked" cards were used.

On these undisputed material facts, we hold that Kelly's action is barred as a matter of law and strong public policy, and thus the court properly granted summary judgment in favor of respondents. As we have discussed, California's long-standing public policy regarding gambling is a broad, strong policy against judicial resolution of civil claims arising out of gambling contracts or transactions, and this public policy, in the absence of a statutory right to bring such claims, applies to both actions for recovery of gambling losses and actions to enforce gambling debts. (*Wallace, supra,* 73 Cal.App.2d at pp. 29-30; *Hamilton, supra,* 30 Cal.2d at pp. 51-52; *Metropolitan, supra,* 15 Cal.App.4th at p. 1828.)

The Legislature has not enacted a statute permitting the use of the process of the courts in California to resolve the kind of gambling loss claims asserted in Kelly's amended complaint. In the absence of such a statutory right, California's strong public policy against judicial resolution of civil claims arising out of gambling contracts or transactions necessarily applies to Kelly's claims, notwithstanding shifting public attitudes about gambling and public acceptance of some forms of gambling both in California (*Metropolitan, supra,* 15 Cal.App.4th at pp. 1828, 1830) and on California Indian lands.

The *Wallace* case, in which the plaintiff alleged the defendant had defrauded him by using a deck of "marked cards" during their participation in a blackjack game, holds: "Where the parties voluntarily engage in a gambling game which is prohibited by law, in the absence of a statute authorizing a recovery of gambling losses, neither courts of law nor equity will aid or assist either party to enforce rights growing out of that illegal transaction." (*Wallace, supra,* 73 Cal.App.2d at p. 26, italics omitted.)

Here, Kelly attempts to distinguish the *Wallace* decision by contending that the form of blackjack played at the Sycuan casino (called Sycuan 21) is not an illegal banking or percentage game within the meaning of section 330,

and thus California's public policy does not apply to his tort claims. We reject Kelly's contention. California's public policy against judicial resolution of civil claims arising out of gambling contracts or transactions absent a statutory right to bring such claims, applies to all forms of gambling, whether legal or illegal. (*Lavick, supra,* 83 Cal.App.2d at pp. 382-383; *Tokar, supra,* 138 Cal.App.2d at p. 354.)

In sum, we conclude that Kelly's claims are barred as a matter of law and strong public policy, regardless of whether the games of blackjack in which he participated as "banker" at the Sycuan Casino were proscribed games of twenty-one within the meaning of section 330, or whether those games were lawful under federal statutory law governing gaming on California Indian lands.[24]

## IV

### *Kelly's Claims Are Barred Under the in Pari Delicto Doctrine*

We also hold that the undisputed material facts in this case establish that the form of blackjack in which Kelly and the respondents participated at the Sycuan Casino, Sycuan 21, is proscribed by section 330 if played in California, even if the playing of that game at the Sycuan Casino were lawful under federal Indian gaming law, and thus Kelly's claims are barred as a matter of law and public policy on the additional ground that the parties were in pari delicto during their participation in the allegedly "rigged" blackjack games.

■ Under California's in pari delicto doctrine, neither courts of law nor courts of equity will aid or assist a plaintiff to recover money lost in a gambling game that is prohibited by law, regardless of where it is played and even if the loss resulted from cheating, absent a statute authorizing recovery of the gambling losses. (*Wallace, supra,* 73 Cal.App.2d at pp. 26-27.) This doctrine is based on the theory that the illegality of the transaction makes the loser in pari delicto[25] with the winner, and public policy precludes courts from declaring and distinguishing between degrees of turpitude of parties who engaged in unlawful transactions. (*Ibid.*)

■ Here, the undisputed material facts establish that the form of blackjack in which Kelly and the respondents engaged at the Sycuan Casino is proscribed by section 330 if played in California. As we have discussed, the playing or carrying on in California, for money or other representative of

---

[24]See footnote 3, *ante.*
[25]See footnote 4, *ante.*

value, of (among other things) "any" game of twenty-one or "any" banking game played with cards, is punishable as a misdemeanor under section 330.[26] As we shall explain, the undisputed material facts in this case establish that the blackjack game involved in this matter, Sycuan 21, is both a game of twenty-one, and a banking game played with cards, within the meaning of section 330, that Kelly and the respondents played or carried on for money.

In his written opposition to respondents' summary judgment motion, Kelly submitted a separate statement under section 437c, subdivision (b), in which he admitted it was "[u]ndisputed that plaintiffs' claimed damages arise from moneys lost in Black Jack games at the [Sycuan Casino] for which plaintiffs provided the 'bank'." Kelly cited paragraph 11 of his fourth amended complaint, in which he alleged in part: "Beginning in or about late 1993 and continuing through the middle of 1994, *plaintiffs 'banked' Black-jack games at the Sycuan Casino by financially backing the Blackjack dealer and paying the dealer's losses to card players. In exchange, plaintiffs received all of the dealer's winnings. . . .*" (Italics added.) Kelly also cited paragraph 3 of the declaration of plaintiff and appellant David Smith (Smith), who stated: "The claims made in this lawsuit by me and my co-plaintiffs all arise from moneys lost in Blackjack for which we provided the 'bank.'" In paragraph 2 of his declaration, Smith explained the banker's advantage in games of blackjack: "Statistically, the banker has an approximate 2% statistical advantage per hand over the participating card players. . . ." In his separate statement, Kelly also admitted it was undisputed that, "[p]laintiffs 'banked' 'twenty-one' games against other players, by collecting from the losers and paying the winners, such that [p]laintiffs had a stake in the outcome of each hand."

These undisputed material facts establish that the game of Sycuan 21 is a game of blackjack, and thus constitutes "any game of . . . twenty-one"[27] within the meaning of section 330. The playing or carrying on, for money, of this prohibited game in California is punishable as a misdemeanor under that statute.

The undisputed material facts we have reviewed further establish that the game of Sycuan 21 constitutes "any banking . . . game played with cards" within the meaning of section 330, such that the playing of this prohibited game in California would be punishable as a misdemeanor under that statute. For reasons we have already discussed, we reject Kelly's contention that banked card games played for money are not proscribed "banking" games

[26]See the discussion of section 330 in part IB.2., *ante.*
[27]See footnote 1, *ante.*

within the meaning of section 330 "where any person could 'bank' the games at any time (i.e., the bank rotated) and the 'house' at no time banked the games . . . ."[28] As we have explained, a card game played for money can be a banking game prohibited by section 330, even when the house does not act as the bank, if under the rules of play it is possible for another entity, a player, or an observer to maintain a bank or operate as a bank during the play of the game. (*Oliver, supra,* 66 Cal.App.4th at p. 1408.) Here, Kelly admits he banked games of Sycuan 21 against other players by collecting from the losers and paying the winners, and he had a stake in the outcome of each hand. Even if it is possible under the Sycuan 21 rules of play for the bank to rotate at any time during games of Sycuan 21, as Kelly contends, such fact is immaterial. To paraphrase *Oliver,* it is the *potential* for a banked game under Sycuan 21's rules, and not the current mode of play, which determines whether Sycuan 21 is a banking game.

Here, as in *Oliver,* this potential for a banked game arises because under the Sycuan 21 rules of play the position of banker does not have to rotate, and thus it is possible for one player with a significant amount of money to act as the banker for repeated hands. (*Oliver, supra,* 66 Cal.App.4th at pp. 1408-1409.) In any event, the undisputed material facts establish not only that Kelly had a significant sum of money while he served as the banker, but also that he acted in that capacity for repeated hands. Given all these undisputed facts, nothing more need be shown to establish that the games of Sycuan 21 in which Kelly and the respondents participated were prohibited banking games played with cards for money within the meaning of section 330, and the playing of that game in California would be punishable as a misdemeanor under that statute.

In our view, the fact that the games of Sycuan 21 from which this action arose were carried on at the Sycuan Casino, on Indian land, is immaterial for purposes of determining whether Sycuan 21 is a prohibited form of gambling under section 330. (*Wallace, supra,* 73 Cal.App.2d at p. 26 ["The card game known . . . as 'Twenty-One' is specifically prohibited by section 330 . . . regardless of where it is played."].) In their arguments regarding the applicability of the in pari delicto doctrine, however, the parties raise the issue of whether the playing of Sycuan 21 on Indian lands is lawful. Respondents argue that the playing of Sycuan 21 at the Sycuan Casino is lawful under federal Indian gaming law, but such gambling activity is illegal anywhere else in California, and thus Kelly is barred from recovery in any California court because he was in pari delicto with other Sycuan 21 gamblers at the Sycuan Casino.

---

[28]See the discussion of what constitutes a "banking game" within the meaning of section 330 in part IB.3., *ante.*

In response, Kelly contends the courts in California must provide him a forum for adjudicating his causes of action for recovery of his Sycuan 21 gambling losses because those claims "arose out of the *lawful* playing of Sycuan 21 on the Sycuan Indian Reservation." He further contends that because the Sycuan 21 games were lawful when played at the Sycuan Casino, the in pari delicto doctrine (discussed, *ante*) does not bar recovery on his claims. Because the parties have raised the question of whether the playing of Sycuan 21 on Indian lands is lawful, we now address this final issue.

### A. *Indian Gaming Regulatory Act of 1988*

■ The Indian Gaming Regulatory Act of 1988 (IGRA) (25 U.S.C. §§ 2701-2721) "creates a framework for Indian tribes to conduct gaming activities on tribal lands." (*Rumsey Indian Rancheria of Wintun Indians* v. *Wilson* (9th Cir. 1994) 64 F.3d 1250, 1255 (*Rumsey*), opn. amended on den. of rehg. 99 F.3d 321, cert. den. *Sycuan Band of Mission Ind.* v. *Wilson* (1997) 521 U.S. 1118 [117 S.Ct. 2508, 138 L.Ed.2d 1012].) The *Rumsey* court explained that IGRA divides gaming into three classes: "Class I" consists of social games for minimal prizes and traditional Indian games; "Class II" includes bingo and similar games of chance such as pull tabs and lotto; and "Class III" includes all games not included in class I or II. (*Rumsey, supra,* 64 F.3d at pp. 1255-1256, citing 25 U.S.C. § 2703(6)-(8).[29]) The federal regulations that implement IGRA, 25 Code of Federal Regulations section 501.1 et seq. (1998) (hereafter, the Regulations),[30] set forth more detailed definitions of class II and class III gaming, which we now discuss.

### 1. *Class II gaming*

Class II gaming is defined in section 502.3(c)(1), of the Regulations, which provides in part: "*Class II gaming* means: [¶] . . . [¶] (c) *Nonbanking* card games that: [¶] (1) State law explicitly authorizes, or does not explicitly prohibit, and are *played legally anywhere in the state . . . .*" (Some italics

---

[29]Subdivisions (6) through (8) of 25 United States Code section 2703 define the terms "class I gaming," "class II gaming," and "class III gaming," and provide in part:

"For purposes of this chapter— [¶] . . . [¶] (6) The term *'class I gaming'* means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations. [¶] (7)(A) The term *'class II gaming'* means— [¶] . . . [¶] (ii) card games that— [¶] . . . [¶] (II) are not explicitly prohibited by the laws of the State and are played at any location in the State . . . . [¶] (B) The term 'class II gaming' does not include— [¶] (i) *any banking card games, including* baccarat, chemin de fer, or *blackjack (21) . . . .* [¶] . . . [¶] (8) The term *'class III gaming'* means all forms of gaming that are not class I gaming or class II gaming." (Italics added.)

[30]Regulations section 501.1 provides in part: "This chapter implements the Indian Gaming Regulatory Act."

added.) A card game conducted on California tribal lands thus constitutes class II gaming under IGRA if it is a nonbanking game that is either explicitly authorized by California law, or is not explicitly prohibited by California law, and is played legally anywhere in the state. This definition, which is plain on its face, does not include banked card games or card games that are unlawful if played in this State.

### 2. *Class III gaming*

Class III gaming is defined in section 502.4(a)(1), of the Regulations, which provides in part: "*Class III gaming means all forms of gaming that are not class I gaming or class II gaming*, including but *not limited to*: [¶] (a) *Any house banking game*, including but not limited to—[¶] (1) *Card games* such as baccarat, chemin de fer, *blackjack (21)*, and pai gow (if played as house banking games)[.]" (Some italics added.) This definition, which is plain on its face, expressly provides that the term "[c]lass III gaming" means "all forms of gaming that are not class I gaming or class II gaming," and is "not limited to" the specific types of gaming listed in the definition. A card game conducted on California tribal lands thus constitutes class III gaming under IGRA if it is neither class I gaming nor class II gaming. (Regs. § 502.4(a)(1).)

### 3. *Sycuan 21 is a class III card game*

Sycuan 21 is not a form of class I gaming, which under IGRA " 'consists of social games for minimal prizes and traditional Indian games.' " (*Rumsey, supra,* 64 F.3d at p. 1255; 25 U.S.C. § 2703(6); Regs. § 502.2.[31]) Sycuan 21 is thus a form of either class II or class III gaming. (Regs. § 502.4(a)(1).)

Respondents contend that Sycuan 21 is a class II card game. We reject this contention, and hold that Sycuan 21 is a class III card game under IGRA. As we have discussed, IGRA expressly provides that "[t]he term 'Class II gaming' does not include [¶] . . . *any* banking card games, including . . . blackjack (21)." (25 U.S.C. § 2703(7)(B)(i), italics added; see fn. 29, *ante*). In defining class III gaming as all forms of gaming that are not class I gaming or class II gaming, the Regulations expressly provide in part that class III gaming includes, but is not limited to "[a]ny *house* banking game." (Regs. § 502.4(a)(1), italics added.)

Because IGRA expressly provides that class II gaming does not include any banking card games, including blackjack, and the Regulations do not

---

[31]Regulations section 502.2 provides:

"*Class I gaming* means: [¶] (a) Social games played solely for prizes of minimal value; or [¶] (b) Traditional forms of Indian gaming when played by individuals in connection with tribal ceremonies or celebrations."

limit class III cards games to card games that are banked by the house, we conclude that any banking card game played for money on Indian lands, even a banking game in which someone other than the house acts as the banker, is a class III card game under IGRA and the Regulations. (25 U.S.C. § 2703(7)(B)(i); Regs. § 502.4(a)(1); *Oliver, supra,* 66 Cal.App.4th at p. 1408.)

Here, as we have discussed, the undisputed material facts establish that Sycuan 21 is both a game of "twenty-one" expressly prohibited in California by section 330, and a "banking . . . game played with cards . . . for money" that is also proscribed by that statute. We thus conclude that Sycuan 21 is a class III card game under IGRA. (25 U.S.C. § 2703(7)(B)(i); Regs. § 502.4(a)(1); *Oliver, supra,* 66 Cal.App.4th at p. 1408.)

### 4. *Card games unlawful in California are unlawful on California Indian lands*

"IGRA provides that 'Class III gaming activities shall be lawful on Indian lands *only if* such activities are . . . located in a State that *permits such gaming* for any purpose by any person, organization, or entity . . . .' " (*Rumsey, supra,* 64 F.3d at p. 1256, citing 25 U.S.C. § 2710(d)(1)(B).[32]) IGRA's class II gaming provisions contain similar language: "An Indian tribe may engage in . . . *class II* gaming on Indian lands . . . *if* [¶] . . . *such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity . . . .*" (25 U.S.C. § 2710(b)(1)(A), italics added.[33]) "Consequently, where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities." (*Rumsey, supra,* 64 F.3d at p. 1256.)

### 5. *Because Sycuan 21 is illegal in California, it is illegal on California Indian lands, and Kelly's claims are barred under the in pari delicto doctrine*

Because the game of Sycuan 21, a class III banked game of twenty-one, is proscribed by section 330 and thus not permitted in California, we conclude that the playing of that game for money at the Sycuan

---

[32]25 United States Code section 2710(d)(1)(B), provides in part: "(d) Class III gaming activities . . . [¶] (1) *Class III* gaming activities shall be lawful on Indian lands *only if* such activities are— [¶] . . . [¶] (B) located in a State that *permits such gaming* for any purpose by any person, organization, or entity . . . ." (Italics added.)

[33]25 United States Code section 2710(b)(1)(A), provides: "(b) Regulation of class II gaming activity . . . [¶] (1) An Indian tribe may engage in . . . *class II* gaming on Indian lands within such tribe's jurisdiction, *if*— [¶] (A) such Indian gaming is located within a State that *permits such gaming* for any purpose by any person, organization or entity . . . ." (Italics added.)

Casino is also unlawful under IGRA. (*Rumsey, supra,* 64 F.3d at p. 1256; 25 U.S.C. § 2710(d)(1)(B).) The undisputed material facts establish that all of Kelly's claims for recovery of gambling losses arose out of games of Sycuan 21 that he carried on at the Sycuan Casino on California Indian land. We thus hold that Kelly's claims are barred under California's in pari delicto doctrine on the additional ground that Sycuan 21 is a form of class III gaming that is illegal on California Indian lands because it is illegal in California. Accordingly, we conclude the court properly granted summary judgment in favor of the respondents.

DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

McDonald, J., and McIntyre, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 1, 1999.